194 F.3d 788 (7th Cir. 1999)
 WILLIAM H. SILK, Plaintiff-Appellant,
v.
CITY OF CHICAGO, WILLIAM BATTS, in his individual and official capacity as Commander of the Chicago Police Department, and JOHN GUARNIERI, in his individual and official capacity as Lieutenant of the Chicago Police Department, Defendants-Appellees.
 No. 98-1155
 In the United States Court of Appeals For the Seventh Circuit
 Argued December 3, 1998
Decided October 8, 1999
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 95 C 143--David H. Coar, Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Before CUDAHY, RIPPLE and ROVNER, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Sergeant William H. Silk brought this action against the City of Chicago ("the City") and two of its police officers. Sergeant Silk alleged that they violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 by discriminating against him and by subjecting him to a hostile work environment because of his disability, sleep apnea. In the district court, Sergeant Silk raised other claims, including a federal civil rights claim and pendent state law claims. He now appeals only the dismissal on summary judgment of the disability discrimination and hostile work environment claims. For the reasons set forth in this opinion, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts[1]
 
 3
 Sergeant Silk, a police officer with the City's Chicago Police Department ("CPD") since 1970, was promoted to the rank of sergeant in 1986 and was assigned to the 6th Police District in 1990. He had a commendable work record, with good performance evaluations and no record of conflicts with co-workers. During the periods relevant to this case, two of Sergeant Silk's superior officers at the 6th Police District were Commander William Batts and Lieutenant John Guarnieri. The 6th District, like others in the CPD, assigned its police officers on a rotating basis to one of three shifts: the first watch (11 p.m. or 12 midnight to 7 or 8 a.m.), the second watch (7 or 8 a.m. to 3 or 4 p.m.), and the third watch (3 or 4 p.m. to 11 p.m. or 12 midnight). Needless to say, for most police officers, working the second watch is much more desirable than working the first or third watch.
 
 
 4
 In 1992, Sergeant Silk was diagnosed with severe sleep apnea, a condition characterized by interruptions in breathing during sleep. According to the record, although sleep apnea itself is not fatal, the secondary cardiovascular effects--including hypertension and stroke--can be. Sergeant Silk's physician informed the CPD that he needed to work a steady shift because of his sleep apnea. His sleep specialist physician at the Sleep Disorder Center of Rush- Presbyterian-St. Luke Hospital did not recommend a particular watch, but did note that working the night shift is not ideal for someone with a sleep disorder. The CPD then assigned Sergeant Silk to "convalescent duty" status, with the job restrictions of "no first watch" and "no change in shift." Three months later, in June 1992, after further letters from the sleep specialist physician and Sergeant Silk's attorney, his status was changed to "limited duty," which is a longer term restriction and which also included a "no first watch" restriction. In January 1993, Sergeant Silk's physician sent another letter, this time requesting that, due to his sleep apnea, he work only the "second watch" day shift. The Medical Services Section of the CPD further accommodated Sergeant Silk; from January 1993 on, he worked only the day shift.
 
 
 5
 Sergeant Silk, who has two masters degrees in law-related fields and a Ph.D. in public administration, did have other employment: He was an instructor for Chicago State University and taught a class once a week, 6-7:30 p.m. He taught in order to supplement his income and, he hoped, to make teaching his career after he retired from the CPD. Police officers are subject to restrictions concerning secondary employment; General Order 89-8, promulgated by the Superintendent of the CPD in 1989, establishes the conditions under which police officers may work a second job. It states that CPD members who are on limited duty may not engage in secondary employment inconsistent with the member's limitations.[2] In December 1993, Commander Batts submitted a complaint with CPD's Internal Affairs Division ("IAD") charging that Sergeant Silk was violating the General Order by teaching while on limited duty status.
 
 
 6
 At a hearing on the charge, Sergeant Silk explained that his teaching once a week from 6 p.m. until 7:30 p.m. did not affect his normal sleep pattern, violate his medical profile, interfere with his duties as a police officer or violate any General Order. However, in January 1994, after its investigation, the IAD ordered Sergeant Silk to cease and desist working secondary employment while on limited duty status. Sergeant Silk appealed the order to the Director of the IAD. The Director denied the appeal, stating that, "since you are unable to work the third watch for the Chicago Police Department, there is no justification for permitting you to work the third watch or any segment of the third watch for a secondary employer." R.71, Dfts' 12(M) Stmt. para. 63. Sergeant Silk was suspended for five days as a result of his violation of Order 89-8. Shortly thereafter, on January 28, 1994, the Sergeant filed a charge of disability discrimination against the City with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC").
 
 
 7
 After the accommodations to his sleep apnea condition were made, Sergeant Silk submits that every aspect of his conditions of employment deteriorated. The Sergeant claims that, as a result of the resentment among officer co-workers and supervisors over the fact that he worked only the day watch, he was subjected to a hostile work environment which manifested through a pattern of harassment. He describes and categorizes the harassment and hostility he endured in the following way:
 
 
 8
 A. Verbal Harassment. Other sergeants and lieutenants in the district openly criticized him and treated him with ongoing hostility. Sergeant Silk offered two examples: (1) At roll call, Captain Burns referred to Sergeant Silk's "[vulgarity] medical problem." R.76, Ex.A at 64. (2) In a public lobby area, defendant Lt. Guarnieri called Silk a "useless piece of [vulgarity]"; he also referred to him as a "medical abuser" and "limited duty phony." Id. at 232-33. Sergeant Silk states that he complained verbally to Commander Batts about Captain Burns' comment but did not complain about Lieutenant Guarnieri's remarks and generally did not report the harassment because, he asserts, such remarks were an ongoing problem and because senior officers were among the perpetrators.
 
 
 9
 B. Threats of Physical Violence. According to Sergeant Silk, co-worker Sergeant Sumner Jones threatened him. In his deposition, Sergeant Silk states that, when he was working the desk, Sergeant Jones walked up and stated, "You are a phony medical limited duty, and if I were in industry, they would order me to kick your [vulgarity] and all this." R.76, Ex.A at 241. A few minutes later, Jones returned and said, "Get out of my way, Silk. It won't take much to have me knock you on your [vulgarity] right now." Id. At that point, Sergeant Silk stated, he began composing his complaint to Commander Batts about the incident.
 
 
 10
 On October 6, 1994, Sergeant Silk complained in writing to Commander Batts, who then registered the complaint with the IAD. There was an investigation; Sergeant Silk's allegations were not sustained, and no discipline was imposed. After that, Sergeant Jones apologized for being "really out of line there," id. at 242, and stayed away from Sergeant Silk.
 
 
 11
 Sergeant Silk also contended that Captain Burns told him that he should be careful because there might be a bomb under his car. Although the Sergeant testified in his deposition that he took the captain's statement seriously, he also realized that Captain Burns was known for making statements like that and he did not report the bomb threat to anyone.
 
 
 12
 C. Lowered Performance Ratings. Before the accommodations were made, Sergeant Silk's performance ratings typically had no negative comments, and his scores had been in the 90s (on a scale of 100). However, after being assigned to limited duty, the Sergeant claimed, his ratings dipped, and negative comments were written on his evaluations, with reference to his disability and to the resentment by his peers of his inability to work any night watch.
 
 
 13
 D. Compelled Loss of Secondary Employment. After Commander Batts submitted a complaint claiming that Sergeant Silk's teaching violated the CPD's Order 89-8 concerning secondary employment, the CPD ordered him to stop teaching and suspended him for violating Order 89-8.
 
 
 14
 E. Administrative Harassment. Sergeant Silk listed a number of administrative decisions that he termed "petty harassments." Appellant's br. at 10. He contended that earned days of leave were taken away or changed without justification; that he was not allowed to "act up" to the higher supervisory level of field lieutenant;[3] or that sometimes he was not given other patrol cars to supervise.[4] As a result, he asserted, he was an object of ridicule among patrol officers in the District. In addition, he pointed out, Commander Batts chastised him for wearing orthopedic shoes- -even though he had medical authorization to wear them.
 
 B. Decision of the District Court
 
 15
 The district court first considered whether Sergeant Silk was a qualified individual with a disability. It determined that sleeping, like breathing, is a major life activity and that, if his sleep apnea is severe enough, it would substantially limit a major life activity. Because the severity of Sergeant Silk's sleep apnea was a disputed material fact, the court assumed, for purposes of the summary judgment motion, that it was sufficiently severe to qualify.
 
 
 16
 The district court next assumed, without deciding, that harassment that rises to the level of a hostile work environment constitutes a viable claim under the ADA, as it does under Title VII. Nevertheless, once accepting Sergeant Silk's claim, the court found that the Sergeant could not prove that he had been subjected to a hostile environment. In particular, it noted, the Sergeant failed to report most of his claims of hostile conduct to higher officers in the CPD or to show that Commander Batts or any other supervisory CPD officer knew or should have known of the harassing behavior. Moreover, the complaints that Sergeant Silk did report, including the Sumner Jones incident, were acted upon, and the conduct was remedied.
 
 
 17
 The court also held that Sergeant Silk failed to prove retaliation because he offered no evidence tending to show that he suffered an adverse employment action or that such action was causally linked to the protected activity of requesting ADA protection. After rejecting Sergeant Silk's other claims, the court granted summary judgment to the defendants.
 
 II
 DISCUSSION
 
 18
 Sergeant Silk submits that the district court erred in granting summary judgment because there is a genuine issue of material fact concerning whether the harassing conduct of the officers and superiors with whom he worked rose to the level of actionable discrimination. The defendants respond that the Sergeant's assertions should be analyzed as retaliation claims rather than as discrimination or harassment charges. Throughout this appeal, the Sergeant freely interchanges allegations of discrimination, harassment, hostile workplace environment and retaliation with virtually no effort to distinguish the causes of action. Therefore, as we were required to do in Sweeney v. West, 149 F.3d 550, 554 (7th Cir. 1998), in this case we shall disentangle the Sergeant's various challenges to determine whether they succeed on appeal.[5]
 
 A. Standard of Review
 
 19
 We review de novo the district court's grant of summary judgment to the defendants and examine the record as a whole while viewing all of the evidence in the light most favorable to the nonmoving party. If the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is proper. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In order to avoid summary judgment, Sergeant Silk, the nonmoving party, was required to set forth "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), and, further, had to produce more than a scintilla of evidence in support of his position, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In fact, "there must be evidence on which the jury could reasonably find for" Sergeant Silk. Id. In addition, we note that summary judgment standards are applied with greater scrutiny in employment discrimination cases, in which intent and credibility are crucial issues. See Talanda v. KFC Nat'l Management Co., 140 F.3d 1090, 1095 (7th Cir.), cert. denied, 119 S. Ct. 164 (1998); Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995).
 
 
 20
 B. ADA/Rehabilitation Act Claim: Discrimination, Retaliation
 
 
 21
 The ADA and Rehabilitation Act prohibit an employer from discriminating against a qualified individual with a disability because of the disability.[6] See 42 U.S.C. sec. 12101; 29 U.S.C. sec. 794(a). The discrimination provisions may be invoked only by one who is a "qualified individual with a disability," that is, someone who can perform the essential functions of his job with or without a reasonable accommodation.[7] 42 U.S.C. sec. 12112(a)-(b); sec. 12111(8); see Cleveland v. Policy Management Sys. Corp., 119 S. Ct. 1597, 1603 (1999); Corder v. Lucent Techs. Inc., 162 F.3d 924, 928 (7th Cir. 1998).
 
 1.
 
 22
 Sergeant Silk's status as a qualified individual under the ADA is not challenged on appeal. The district court concluded that Sergeant Silk satisfied that criterion; it held that the sleep apnea from which he suffered affected the major life activities of breathing and sleeping and was sufficiently severe, it assumed for the purposes of summary judgment, to qualify under the ADA.[8] Moreover, the parties do not debate this issue; when Sergeant Silk notified the CPD that he suffers from a disability, sleep apnea, the CPD accepted his designation of the condition as a disability. We are not asked, and therefore decline, to decide whether sleep apnea, at the severity described in this record, is a disability under the ADA.
 
 
 23
 Another issue not on appeal in this case is accommodation. When the Sergeant requested no first watch, his request was approved. When he requested only second watch, again he was provided with the requested accommodation. See Feliberty v. Kemper Corp., 98 F.3d 274, 280 (7th Cir. 1996) ("Determining whether an accommodation is reasonable depends, to a significant extent, upon determining whether the employer has acceded to the disabled employee's request."). Sergeant Silk has not complained that the accommodations were unreasonable or in any way missed the mark. Moreover, we note that the CPD engaged in an interactive process with the Sergeant and gave him the accommodations that enabled him to continue working. See 29 C.F.R. sec. 1630.2(o)(3); Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998) (describing interactive process between employer and employee to determine the appropriate accommodation). Therefore, we accept that the CPD made all of the reasonable accommodations sought by Sergeant Silk for his disability.
 
 2.
 
 24
 The first count of Sergeant Silk's complaint is a retaliation claim under the ADA. The retaliation provision protects any individual who "has opposed any act or practice made unlawful by [the ADA] or . . . has made a charge [under the ADA]." 42 U.S.C. sec. 12203(a). It further provides that it is "unlawful to coerce, intimidate, threaten, or interfere with any individual . . . on account of his or her having . . . exercise[d] . . . any right granted or protected by [the ADA]." 42 U.S.C. sec. 12203(b). A plaintiff bringing a retaliation claim may prevail by presenting either direct evidence of discrimination or indirect evidence under the burden-shifting method set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Smart v. Ball State Univ., 89 F.3d 437, 439 (7th Cir. 1996). One following the latter course first must demonstrate a prima facie case of retaliation: He "'must establish that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action.'" Talanda, 140 F.3d at 1095 (quoting Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1459 (7th Cir. 1995)). If the employee succeeds in proving his prima facie case, the employer then must offer a nondiscriminatory reason for its adverse action. If the employer's justification is lawful, the employee then must rebut that legitimate reason and establish that a discriminatory motive was the determining factor behind the employer's action. See id. at 1095-96. "Although the burden of production shifts under this method, 'the burden of persuasion rests at all times on the plaintiff.'" Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998) (quoting Klein v. Trustees of Indiana Univ., 766 F.2d 275, 280 (7th Cir. 1985)).
 
 
 25
 In this case, we focus in particular on the second step in the prima facie case, the adverse employment action. An employee claiming retaliation must show that he suffered a "materially adverse employment action." McDonnell v. Cisneros, 84 F.3d 256, 258 (7th Cir. 1996). We have defined the phrase broadly in this circuit; it of course includes readily quantifiable losses such as loss or reduction of pay or monetary benefits, but it can encompass many other forms of adversity. See Smart, 89 F.3d at 441 (citing examples). Adverse employment actions include "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. sec. 12112(a). Minor or trivial actions that make an employee unhappy are not sufficient to qualify as retaliation under the ADA. See Smart, 89 F.3d at 441. When the employee demonstrates that the action against him was adverse, he then must show that there was a causal link between that action and the expression protected under the ADA.
 
 
 26
 a.
 
 
 27
 Sergeant Silk's first claim is that, even though the CPD did accommodate him by giving him the day watch, it discriminated and retaliated against him by forbidding him from teaching as his secondary employment and by suspending him for his violation of the secondary employment rule in Order 89-8.
 
 
 28
 Order 89-8 sets forth a general policy, applicable to all police department members, concerning secondary employment. It states that police work takes priority over all other employment and that secondary employment will not be allowed to infringe on any department responsibilities or obligations--including emergencies, special assignments and overtime duties. The Order further prohibits those on limited duty status, like Sergeant Silk, "from engaging in secondary employment which requires activities not permitted by" that status. In Sergeant Silk's case, the IAD concluded, after formal investigation and hearings, that, because his disability precluded him from working for the CPD at any time other than the day watch, it likewise precluded him from working secondary employment during those other times.
 
 
 29
 In our view, this conclusion in no way evidences discrimination or retaliation, direct or indirect. The decision itself--requiring him to stop working his second job--does not reflect any acknowledgment of the CPD's discriminatory intent or motive. See Rothman v. Emory Univ., 123 F.3d 446, 451 (7th Cir. 1997). The CPD's department rules prohibit all officers from working in secondary employment inconsistent with the condition of their limited duty status, and this officer, Sergeant Silk, was reported for violating that rule. Cf. Phillips v. Hall, 447 N.E.2d 418, 422-23 (Ill. App. Ct. 1983) (recognizing the propriety of promulgating and enforcing police force's secondary employment rules; noting police chief's responsibility to community of securing maximum efficiency from police force). The Sergeant has not proffered evidence that the policy was applied inconsistently or that others were treated more favorably than he was. The administrative procedures of the CPD were followed and Sergeant Silk had every opportunity to voice his objections and to appeal the IAD's ruling that he had violated the order. Nothing in the record reveals any discriminatory bias in IAD's handling of the process.
 
 
 30
 Nor can the decision be retaliatory under the indirect burden-shifting method. The CPD's refusal to allow Sergeant Silk to pursue secondary employment and the five-day suspension certainly can be considered adverse employment actions. See Biolchini v. General Elec. Co., 167 F.3d 1151, 1154 (7th Cir. 1999) (treating a one- week suspension as an adverse employment action). However, to satisfy the third prong of the prima facie test, the Sergeant must demonstrate a causal link between the protected expression, namely the accommodation sought for his disability, and the adverse action. Adusumilli, 164 F.3d at 363; Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir. 1994). The record contains no such link. The order to stop teaching came a year after the accommodation, not "close on the heels" of his protected activity; thus, there is no evidence of "suspicious timing" or "telling temporal sequence" to support the claim. See Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1034 (7th Cir. 1999); Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1014-15 (7th Cir. 1997). Nor has Sergeant Silk demonstrated any other tie between his being assigned to the day watch he requested as a reasonable accommodation and his being ordered to stop teaching one evening a week. Moreover, he has shown no adverse action with respect to his actual police work: The Sergeant was granted every accommodation and kept the same job at the same salary and at the same location.
 
 
 31
 Even if the Sergeant had demonstrated his prima facie case, however, the City's reason for refusing his secondary employment was legitimate and nondiscriminatory, and Sergeant Silk has offered no evidence that the reason was pretextual. The district court correctly concluded that the claim must fail because Sergeant Silk did not offer evidence regarding the City's motives in forbidding him to have a second job.
 
 
 32
 We hold that the district court properly determined that the CPD's refusal to allow Sergeant Silk to continue his secondary employment or to grant him an exemption from Order 89-8 is not evidence of discrimination or retaliation.
 
 
 33
 b.
 
 
 34
 Sergeant Silk also submits that he received unwarranted negative performance ratings in retaliation for being put on permanent day shift status. According to Sergeant Silk, in those later reviews he was criticized and graded down by virtue of his disability and its accommodation.
 
 
 35
 The performance of all members of the CPD is reviewed on a semi-annual basis. The CPD's performance rating cards list five categories to be graded: quality of work, quantity of work, dependability, personal relationships, and attendance and promptness. Employees are graded on a scale of 100 and then given a final grade by dividing the total by 5. The rating is approved by two ranking officers. On the back side of the rating card, written comments may be entered for each graded category.
 
 
 36
 Upon examination of the cards in the record and a review of Sergeant Silk's deposition testimony, we note that the Sergeant's ratings throughout his career remained quite consistent--that is, within about 5 points of 90 in either direction. When he worked at the training academy in the late 1970s and early 1980s, Sergeant Silk testified, the range of his evaluations was 85 to 90. In the 1980s he worked in the marine unit and at the Second District, and his ratings were generally in the low 90s. But when he transferred back to the marine unit as a Sergeant, where he remained through 1990, he received his highest overall ratings of 97 on his June and December 1990 reviews. Then he was transferred to the 6th District; his two 1991 evaluations reflected a final rating of 90. Although there are no ratings cards in the record for the year 1992, in which he was accommodated to limited duty with "no first watch," or for 1993, when his limited duty was established as "second watch only," he stated in his complaint that his February 1993 performance rating was 89.8. The June 1994 final rating was 88[9] and the June 1995 final rating was 90.In sum, since being at the 6th District, Sergeant Silk has received performance scores of 90, 89.8, 88, and 90.
 
 
 37
 As for the comments on the back side of the ratings cards, the 1990 and 1991 statements were consistently positive; Sergeant Silk was said to be "above average," "rarely late," "readily available when needed," "very dependable, always cooperative, willing to assist," "works well with the public." R.76, Ex.Q. The Sergeant focuses on the comments written on the backs of the 1994 and 1995 ratings cards in the areas of "dependability" and "personal relationships":[10]
 
 June 1994 rating:
 
 38
 Dependability: Is not capable of working 3rd and 1st watches/sustained CR# for [secondary employment] violations.
 
 
 39
 Personal relationships: Peers resent inability to share 1st and 3rd watch responsibilities.
 
 June 1995 rating:
 
 40
 Dependability: Inability to work nights has adverse impact on this performance trait.
 
 
 41
 Personal relationships: Has endevored [sic] to improve his relations with fellow supervisors.
 
 
 42
 R.76, Ex.R. The Sergeant claims that these ratings are direct evidence of discrimination and retaliation; he submits that they criticized him and lowered his grade because of his disability.
 
 
 43
 We first note that the comments make no reference to his disability other than the truthful statement that he is not able to work the night watches. Second, the Sergeant's scores in those categories are not graded down to any degree even remotely significant.[11] For his June 1994 ratings, he received a score of 88 in Dependability and an 88 in Personal Relations. In June 1995, he received a 90 and 91 respectively. These scores are not appreciably different from the scores he received prior to the CPD's accommodating his disability. Notably, in 1991 (the valuations most proximate to the time in question), Sergeant Silk's scores were 89 and 91 in June and 89 and 90 in December. Finally, Sergeant Silk's lowered performance evaluations claim fails because he provided no evidence that any injury or adverse employment action resulted from the allegedly lower ratings.[12] See Rothman v. Emory Univ., 123 F.3d 446, 452 (7th Cir. 1997) (concluding that dean's letter did not cause disabled law student any injury and that student's having a character and fitness interview was not an adverse consequence); Rabinovitz v. Pena, 89 F.3d 482, 488-89 (7th Cir. 1996) (finding no adverse employment action where lower performance rating did not reduce plaintiff's responsibilities or salary, even though it may have prevented plaintiff from getting discretionary bonus); Smart v. Ball State Univ., 89 F.3d 437, 442-43 (7th Cir. 1996) (determining that negative performance evaluations, alone, do not constitute an adverse employment action, and declining to extend definition of adverse employment action to cover facially neutral evaluations).
 
 
 44
 We therefore agree with the district court that Sergeant Silk's performance ratings offer no evidence of discrimination against him or of retaliation. Sergeant Silk has not come forward with sufficient evidence from which a trier of fact could reasonably infer that the CPD subjected him to retaliation for seeking accommodation for his sleep apnea.[13]
 
 
 45
 C. Hostile Work Environment/Harassment Claim
 
 
 46
 Sergeant Silk submits that the other CPD officers, including his superiors, engaged in a barrage of harassing conduct after he was given permanent day-shift work and that the harassment rose to the level of a hostile work environment. He urges us to consider the cumulative weight of the hostile conduct to which he was subjected every day. Sergeant Silk claims he became a scorned individual and endured open, obscene verbal abuse and physical threats, all explicitly motivated by resentment over his inability to rotate off the day watch due to his disability.
 
 1.
 
 47
 Hostile work environment claims are typically associated with sexual harassment rather than disability claims. This circuit has not recognized explicitly an ADA claim based on hostile environment or harassment. See Miranda v. Wisconsin Power & Light Co., 91 F.3d 1011, 1017 (7th Cir. 1996). In two cases, other circuits have recognized an ADA hostile work environment claim, without discussion, but summary judgment rulings in favor of the employer were affirmed.[14] In Miranda, 91 F.3d at 1017, this court chose not to decide the question whether a claim of constructive discharge stemming from a hostile working environment was cognizable under the ADA because, even assuming that it was, the plaintiff's claim fell far short of what a successful claim would require. Nevertheless, we noted that such a claim "would seem to arise under the general prohibition against discrimination with respect to terms or conditions of employment contained in [42 U.S.C.] sec. 12112(a)" and in 29 C.F.R. sec. 1630.4, which provides that it is unlawful to discriminate against a disabled employee in regard to any "term, condition, or privilege of employment." Id. Most circuits have assumed, without deciding, the existence of such a cause of action, but have declined to recognize it expressly because the cases before those courts were not the appropriate ones in which to make such a determination.[15] We too shall proceed on the assumption that a hostile work environment claim is cognizable under the ADA.
 
 
 48
 To make his claim, Sergeant Silk must follow the methodology already established in the parallel area of Title VII litigation as set forth in the Supreme Court's recent trilogy of Title VII cases, Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998 (1998), Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998), and as summarized by our circuit in Adusumilli v. City of Chicago, 164 F.3d 353 (7th Cir. 1998):
 
 
 49
 In order to prevail on a hostile environment sexual harassment claim, a plaintiff must show that his or her work environment was both subjectively and objectively hostile. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). Furthermore, while employers are vicariously liable for hostile environment sexual harassment by supervisors (subject to certain defenses), Faragher v. City of Boca Raton, 524 U.S. 775, ___, 118 S. Ct. 2275, 2292-93 (1998); Burlington Industries, Inc., 118 S. Ct. at 2270, a plaintiff must show negligence in order to hold an employer liable for co-worker harassment, Baskerville v. Culligan Internat'l Co., 50 F.3d 428, 431-32 (7th Cir. 1995). . . .
 
 
 50
 An objectively hostile environment is one that a reasonable person would find hostile or abusive. Harris, 510 U.S. at 21. In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23,114 S.Ct.367.
 
 
 51
 Id. at 361. Of course, the law "does not prohibit all verbal or physical harassment in the workplace." Oncale, 118 S. Ct. at 1002. To amount to hostile workplace environment, the harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" Faragher, 524 U.S. at ___, 118 S. Ct. at 2283 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).
 
 
 52
 Therefore, Sergeant Silk must demonstrate that a rational trier of fact could find that his workplace is permeated with discriminatory conduct--intimidation, ridicule, insult--that is sufficiently severe or pervasive to alter the conditions of his employment. To establish the severity or pervasiveness of the conduct, he must address such factors as the frequency, severity and threatening or humiliating nature of the discriminatory conduct and whether it unreasonably interferes with his work performance. To establish an alteration in the terms or conditions of his employment or "an adverse employment action," he must demonstrate either a tangible employment action (such as discharge, demotion or undesirable reassignment)[16] or a non-tangible action such as discriminatory conduct which is so severe or pervasive that it creates an abusive working environment. Moreover, the abusiveness of the working environment must qualify both objectively (that is, it must be an environment that a reasonable person would find hostile or abusive) and subjectively (that is, this employee subjectively perceived it to be abusive). Once we can conclude that the discriminatory conduct was sufficiently severe or pervasive to create an abusive working environment, the employer's liability is triggered. In deciding whether an employer can be held liable for the supervisor's harassing comments, we follow the holdings set forth identically in Ellerth and Faragher:
 
 
 53
 An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.
 
 
 54
 Ellerth, 118 S. Ct. at 2270; Faragher, 118 S. Ct. at 2292-93.
 
 2.
 
 55
 Sergeant Silk suggests that many changes occurred in his employment after he requested accommodation. He submits that he was harassed and verbally abused by supervisors Lieutenant Guarnieri and Commander Batts and by other officers; was given negative performance reviews; and was punished through such sanctions as being given no patrol cars or officers to supervise and being sent home to get his regulation shoes. According to the Sergeant, these constitute cognizable adverse employment actions supporting his harassment and retaliation claims.
 
 
 56
 We consider each of the Sergeant's claims. We note first that, with the exception of the matter of his teaching and consequent suspension, none of these incidents culminated in a tangible employment action.[17] No tangible action was taken when his supervisors gave the Sergeant what he called lower performance ratings and evaluations. As we concluded earlier, the dip in the ratings was negligible, the evaluations not unduly critical (in fact, the latest one commended him for trying to improve his relations with fellow supervisors), and they had no effect on his job. See Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996) (lower performance rating was not a material adverse employment action). Nor could it be considered a tangible action that the Sergeant was ordered to get his official footwear for the inspection, for the City did not require that Sergeant Silk wear "regulation shoes" once he made clear that he had medical authorization to wear his orthopedic shoes. Finally, the Sergeant does not allege which supervisor, or which official action, caused his not being given supervisory duties over other officers or squad cars. Without such evidence, the City cannot be held liable. Nor is there evidence that the Sergeant brought his complaint to the proper authorities through the proper complaint procedures, which would have put the City on notice. In our view, Sergeant Silk has failed to set forth specific facts showing that there is a genuine issue as to whether his not being put in charge of other officers or squad cars had tangible results and constituted a "significant change in employment status." See Ellerth, 118 S. Ct. at 2268.
 
 
 57
 We next look at Sergeant Silk's claims of supervisor harassment: Captain Burns' reference at roll call to Sergeant Silk's "[vulgarity] medical problems"; defendant Lieutenant Guarnieri's comments that Silk was a "useless piece of [vulgarity]," a "medical abuser" and "limited duty phony"; and generally ongoing harassment by senior officers. Sergeant Silk asserts that his evidence establishes a pervasive pattern of harassment such that a trier of fact could find that Commander Batts (the highest ranking officer in the 6th District) either knew or should have known that Silk, a Sergeant in his command, was so loathed by his officers that he was an outcast. The Sergeant points out that he complained once to Commander Batts about a threat of physical violence, but that the abuse and harassment continued. He further claims that Commander Batts participated in the discriminatory conduct: He knew that the Sergeant's medical condition related to a sleep disorder, knew that Sergeant Silk was being criticized and graded down, knew that other officers resented Sergeant Silk's accommodation and knew of Lieutenant Guarnieri's repeated expletives when describing how unfair it was that Silk could work a straight day watch. Moreover, it was Batts who initiated the "secondary employment" complaint.
 
 
 58
 Sergeant Silk admits he did not complain about Lieutenant Guarnieri's remarks. However, he claims that he orally reported Captain Burns' comment to Commander Batts, and, even though Commander Batts denies it, we shall take the Sergeant's statement as true in our review of summary judgment. The record clearly demonstrates that Sergeant Silk reported the threat by co- worker Sergeant Jones. He complained to Commander Batts, the person who was authorized to channel such complaints to the proper authority. See Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir. 1997). Commander Batts took the complaint to the IAD, which investigated it, conducted a hearing and concluded that no action should be taken. Afterwards, Sergeant Jones apologized and stayed away from Sergeant Silk. It is noteworthy that the IAD asked Sergeant Silk to explain his allegations that others were harassing him, but the Sergeant refused to divulge the names of other harassers or to describe other incidents. The record therefore establishes that Commander Batts properly carried out his duty to pass on the complaint and that the IAD appropriately responded to the complaint and resolved the co- worker harassment without any negligence.[18] See Faragher, 118 S. Ct. at 2285-86 (employer is liable only if it knew or should have known and failed to take proper remedial steps); Young, 123 F.3d at 673-74.
 
 
 59
 Of those incidents he did not report, Sergeant Silk tells us of two occasions on which he was called names in a public place and one occasion when Captain Burns darkly hinted that the Sergeant might find a bomb under his car one day. (The Sergeant also stated at his deposition that the Captain was known to make those kinds of "jokes"; he did not take the implied threat seriously enough to act on it.) We believe that such isolated unreported incidents were neither frequent nor serious enough to be considered a "hostile workplace environment." Sergeant Silk's evidence fails to establish the rampant harassment he claims. "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 118 S. Ct. at 2283 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998, 1003 (1998)). The one complaint to management about one incident is not sufficient, in this case, to have put the CPD or the City on notice that the Sergeant was experiencing widespread and persistent harassment. Harassment laws cannot be effective if incidents are not reported, and "'an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists.'" Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir. 1999) (quoting Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1038 (7th Cir. 1998)). Finally, in the absence of evidence of pervasive harassment, the record will not support the conclusion that notice ought to be presumed.
 
 
 60
 With respect to the administrative harassment (not putting him in charge of other officers or squad cars, for example), the Sergeant himself even refers to it as "petty," and we conclude that he has not demonstrated a "dramatic downward shift in skill level required to perform" his job responsibilities, see Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994), as he claimed. We therefore hold that the hostile misconduct Sergeant Silk alleges does not rise to the level of a hostile work environment; the incidents of harassment alleged by Sergeant Silk fall short of meeting the standard articulated by Meritor, Harris and their progeny that the harassment be "sufficiently 'severe or pervasive' as to 'alter the conditions of [his] employment and create an abusive working environment.'" Faragher, 118 S. Ct. at 2283.
 
 3.
 
 61
 Nevertheless, the Sergeant urges us to consider the discriminatory conduct collectively and cumulatively, for the separate incidents, when viewed as a whole, may form part of a pattern of harassment that demeans, hurts or humiliates a claimant. We have acknowledged that, in discrimination cases, the "whole can be greater than the sum of the parts," and that it is quite appropriate for a plaintiff to "ask the trier of fact to draw an inference of discrimination from a pattern of behavior when each individual act might have an innocent explanation." Vande Zande v. State of Wisconsin Dep't of Admin., 44 F.3d 538, 546 (7th Cir. 1995). In this case, however, as in Vande Zande, the pattern shows that the employer reasonably accommodated Sergeant Silk's disability requests and reasonably responded to the complaint filed against his co-workerfor the threat. When we consider the incidents of harassment that he recounts, either separately or together, we conclude that they do not rise to the level of a materially adverse employment action because they have not altered a term or condition of Sergeant Silk's employment. Under Title VII, the prototype we are following, "[c]ommon sense and the examples used in the statute's principal section, 42 U.S.C. sec. 2000e-2(a), exclude instances of different treatment that have little or no effect on an employee's job."[19] Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998).
 
 
 62
 In this case, Sergeant Silk received every accommodation to his job that he sought. He has alleged no demotion in rank, no diminution of salary. He has continued to do his job without impediment from the harassing actions of others. In addition, the harassment he endured did not rise to the level of a hostile work environment. Sergeant Silk failed to demonstrate that the workplace was permeated with discriminatory conduct--ridicule, intimidation, insult--that was sufficiently severe or pervasive to alter the conditions of his employment. He has failed to show that any superior officer knew of the harassment he alleges or, in the case of Commander Batts, failed to take action to stop the harassment by Sergeant Jones once he did know about it. In the end, his claims fail because he cannot prove that he suffered a materially adverse action. We hold that the district court was correct in granting summary judgment "[b]ecause of the lack of support for either a harassment or retaliation theory under the ADA or the Rehabilitation Act." R.81 at 26.
 
 Conclusion
 
 63
 For the reasons given above, we affirm the district court's judgment granting summary judgment in favor of the defendants.
 
 AFFIRMED
 
 
 Notes:
 
 
 [1]
 Because the district court granted summary judgment to the defendants, we take the facts alleged by the plaintiff to be true. See Adusumilli v. City of Chicago, 164 F.3d 353, 357 (7th Cir. 1998) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2262 (1998)).
 
 
 [2]
 Order 89-8 establishes the general policy concerning secondary employment:
 The Chicago Police Department has the right to restrict secondary employment for good cause. The duties and obligations of the Chicago Police Department take priority over any other employment. Department members who engage in secondary employment are reminded that their primary responsibility is to the Chicago Police Department. Department members are subject to call at any time for emergencies, special assignments or overtime duty. Secondary employment will not infringe on this obligation.
 R.72, Ex.K, Order 89-8 at III.A. The Order then prohibits secondary employment under a number of conditions, including:
 Secondary employment is prohibited . . . [w]hen a Department member is in the Medical Roll for any reason. Personnel in a limited/convalescent duty status are prohibited from engaging in secondary employment which requires activities not permitted by the limited/convalescent duty status.
 Id. at IV.K.
 
 
 [3]
 As Sergeant Silk explained, "[T]here was a practice that if there were four sergeants working during a tour and there wasn't a field lieutenant, the fourth sergeant would be acting field lieutenant, and in turn be given monetary rewards, whatever the difference in pay is. I was not allowed to do this. In other words, I was always sergeant." R.76, Ex.A at 43.
 
 
 [4]
 The Sergeant explained that the "regular beat" sergeant who came on duty at 7:00 a.m. usually supervised numerous patrolmen and cars, but the "rapid response" sergeant assigned to start at 10:00 a.m. only had one or a few officers to supervise. Sergeant Silk averred in his deposition that he was assigned most often to the rapid response job "because nobody else wanted it," R.76, Ex.A at 146, and sometimes he had no one to supervise.
 
 
 [5]
 Sergeant Silk has brought this case against two of his supervising police officers, Commander Batts and Lieutenant Guarnieri, in their individual and official capacities. However, he has not pursued an argument concerning their personal liability and therefore has waived the claim. Such a claim, in any event, would fail, for the ADA provides only for employer, not individual, liability. Our case law is clear that a supervisor cannot be held liable in his individual capacity under the ADA or under Title VII. See Gastineau v. Fleet Mortgage Corp., 137 F.3d 490, 493 (7th Cir. 1998); Geier v. Medtronic, Inc., 99 F.3d 238, 244 (7th Cir. 1996); Williams v. Banning, 72 F.3d 552, 555 (7th Cir. 1995); U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1279-82 (7th Cir. 1995).
 
 
 [6]
 A plaintiff who brings claims under both the ADA and the Rehabilitation Act, statutes that are nearly identical, can prove his claims by presenting either direct or indirect evidence of discrimination. See Rothman v. Emory Univ., 123 F.3d 446, 451 (7th Cir. 1997). The elements of those claims are substantially similar; the Rehabilitation Act is distinguishable only because it is limited to programs receiving federal financial assistance. Under the ADA, a plaintiff must establish that he suffers from a disability as defined under the Act; is qualified to perform the essential functions of his job, with or without reasonable accommodation; and has suffered adverse employment action as a result of the disability. Under the Rehabilitation Act, he must establish that he suffers from a disability as defined under the Act; that he was otherwise qualified for the job; that he was involved in programs receiving federal financial assistance; and that he was "excluded from participation, denied benefits, or otherwise discriminated against solely because of" his disability. Id. at 452.
 
 
 [7]
 The Rehabilitation Act provides that the ADA standards are to be applied to determine whether the Rehabilitation Act has been violated. See 29 U.S.C. sec. 794(d). We therefore cite to the definitions and standards applied under the ADA in determining whether there has been a disability violation under either statute.
 
 
 [8]
 The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. sec. 12102(2). There is no dispute that the Sergeant is a qualified individual who possesses the requisite skill, education, experience, and training for his position as police officer and is able to perform the essential functions of his job with the reasonable accommodation of steady day shift duty that was accorded to him. See 42 U.S.C. sec. 12111(8); 29 C.F.R. sec. 1630.2(m); Cleveland, 119 S. Ct. at 1603 ("An ADA plaintiff bears the burden of proving that she is a 'qualified individual with a disability.'").
 
 
 [9]
 The first officer rating Sergeant Silk in June 1994, a Lieutenant Evans (not a defendant and not an officer about whom the Sergeant has complained), gave him an overall rating of 85. However, Commander Batts, who had been Sergeant Silk's commanding officer at the 6th District and who was very familiar with his work, re-evaluated the Sergeant and raised his final grade to 88.
 
 
 [10]
 We note, for completeness, that the comments of the other categories have remained consistently positive:
 June 1994 rating:
 Quality of work: Assignments usually submitted with few errors.
 Quantity of work: Usually makes himself available for subordinate consultation.
 Attendance and Promptness: Usually reports to work and submits assignments in timely manner.
 June 1995 rating:
 Quality of work: Has previously refer[r]ed to higher authority decisions which could be made at his level.
 Quantity of work: Willingly accepts assigned tasks and diligently completes assignments in a timely fashion.
 Attendance and promptness: Reports on time and prepared for work.
 R.76, Ex.R.
 
 
 [11]
 The 1995 comment--that Sergeant Silk's inability to work the night watches has an "adverse impact on" his dependability--can be read as lacking discriminatory intent. The dependability of a police officer at his job is measured not only by whether he is there for his "regular shift" but also by whether he can be counted on when changes are needed, extra hours are called for, or flexibility is necessary. Order 89-8 states that Department members are subject to call at any time for emergencies, special assignments or overtime duty. Sergeant Silk, however, limited to the second watch only, could not be called upon for that flexibility. The comments describe in factual terms the Sergeant's post-accommodation situation; they reflect no intent to discriminate against him. Cf. Rothman v. Emory Univ., 123 F.3d 446, 451 (7th Cir. 1997) (determining that the law school dean's letter was an honest evaluation of the plaintiff's difficulties at law school rather than direct evidence that the law school discriminated against him because of his epilepsy).
 
 
 [12]
 The City commented in its brief that performance reviews are not made public and are not used in determining promotions. See Appellants' br. at 14, citing R.71 at para. 71, and R.71, Ex.A at 309. It further suggested at oral argument that negative comments written on the performance evaluations do not lead to an adverse employment action because they are not considered in the promotion process.
 
 
 [13]
 As we discuss at greater length later in this opinion, see infra pages 24-25, Sergeant Silk has failed to demonstrate that his allegedly unfavorable job assignment had tangible results and constituted a significant change in employment status.
 
 
 [14]
 See Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir.), cert. denied, 119 S. Ct. 407 (1998); Cody v. CIGNA Healthcare, 139 F.3d 595, 598 (8th Cir. 1998).
 
 
 [15]
 See, e.g., Walton v. Mental Health Ass'n, 168 F.3d 661, 666-67 (3d Cir. 1999); Wallin v. Minnesota Dept. of Corrections, 153 F.3d 681, 687-88 (8th Cir. 1998), cert. denied, 119 S. Ct. 1141 (1999); Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 788 (8th Cir. 1998); McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998) (per curiam).
 
 
 [16]
 "[A] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" as well as the "denial of a raise or promotion." Ellerth, 118 S. Ct. at 2268.
 
 
 [17]
 The only employment action in this case that could be considered a "tangible" one is the order requiring that Sergeant Silk stop teaching and the subsequent five-day suspension. However, Commander Batts' complaint--which stated that the Sergeant violated Order 89-8 by continuing his secondary employment--was reviewed and decided through the proper administrative procedures. The IAD, an independent branch of the police department, investigated the charge, conducted a hearing on the issue (at which the Sergeant testified) and reconsidered its decision when Sergeant Silk appealed. The Sergeant offers no evidence that the Commander referred the matter to IAD for harassing or retaliatory reasons or that he failed to refer similar complaints. We conclude that Commander Batts did not create an actionable hostile environment by filing the complaint against Sergeant Silk and that the City cannot be held vicariously liable to the Sergeant for that tangible employment action.
 
 
 [18]
 An employer is vicariously liable for a hostile environment created by a supervisor, subject to certain defenses, and is likewise liable for harassment by a co-worker if the employer was negligent and failed to take reasonable steps to discover and remedy the harassment. See Faragher, 118 S. Ct. at 2292-93; Wilson v. Chrysler Corp., 172 F.3d 500, 508 (7th Cir. 1999); Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998).
 
 
 [19]
 Section 2000e-2(a) of Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . or to limit, segregate or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee . . . ."