Vivian J. SMART, Plaintiff–Appellant,

v.

BALL STATE UNIVERSITY,
Defendant–Appellee.

No. 95–3106.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1996.

Decided July 15, 1996.

Kenneth E. Lauter (argued), Haskin, Lauter & Cohen, Indianapolis, IN, for Vivian J. Smart.

Scott E. Shockley (argued), Defur, Voran, Hanley, Radcliff & Reed, Muncie, IN, for Ball State University.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Vivian Smart is a tree surgeon. Before assuming that position she was in a three-year tree surgeon training program. In this suit she claims that early in the training program she was subjected to retaliation by her employer, Ball State University, in response to a sex discrimination charge she previously filed with the EEOC. She lost the suit on summary judgment in the district court, and we now consider her appeal.

Vivian (considering others we will meet in this case, particularly Wayne and DeWayne Hammons, our opinion will be an easier read if we use first names) worked at Ball State for several years before she applied for a position as a tree surgeon trainee. In accordance with university policy, the names of the candidates for the trainee position were presented to a selection committee composed of management and union representatives. Committee members ranked the seven candidates for the program in order of preference, and the rankings were tallied up. Vivian, with a total of 26 points, placed second. The position went to a man named Greg Drown, who scored a 28. After coming up short, Vivian filed a sex discrimination charge with the EEOC, alleging that she lost the trainee position competition, because of her sex, to a less qualified male.

In commendably swift action—about three months—the EEOC brokered a settlement of the claim between Vivian and Ball State. The two entered into an agreement whereby Ball State, without admitting wrongdoing, agreed to create an additional trainee position for Vivian. She started the new job in February of 1993 and received back pay and seniority based on Greg's date of hire in November of 1992.

Less than six months later, Vivian filed a second charge with the EEOC, claiming that Ball State was retaliating against her for having filed the first charge. Title VII of the

Civil Rights Act, of course, prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

In September of 1993, Vivian initiated this suit in the Southern District of Indiana. The initial complaint focused on charges of disparate treatment, claiming that Vivian received less training than Greg; that she received inadequate training; that she was subject to unsafe conditions to which Greg was not exposed; that DeWayne, her immediate supervisor, intentionally gave her incorrect instructions so she would fail; and that Wayne (DeWayne's father and Ball State's assistant supervisor of grounds) and DeWayne recorded her mistakes but never told her how to correct them. These claims were supported by a number of specific instances of allegedly discriminatory conduct. Many of these allegations would be quite serious if true, particularly given Vivian's status as an inexperienced trainee, for tree surgery is rather hazardous work. It involves climbing up trees, using heavy and dangerous power tools and equipment, and chopping down tree limbs in a way that allows them to fall to the ground without doing damage. Purposefully poor training and deliberately inadequate supervision could result in serious injury.

 In order to prevail on a claim of retaliation, a plaintiff must either offer direct evidence of discrimination, or proceed under the burden-shifting method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas* the plaintiff must first prove, by a preponderance of the evidence, a prima facie case of retaliation. The burden then shifts to the employer to provide a nonretaliatory explanation for its actions. Once the employer has offered a neutral reason for its actions, the burden shifts back to the employee to demonstrate that the employer's stated reason is merely a pretext for covering up discriminatory conduct.

The initial claims in this case were based on allegations of disparate treatment. Ball State responded to each allegation in the complaint by producing evidence or providing a nonretaliatory explanation. The university then moved for summary judgment. Because the district court's disposition of the disparate treatment allegations is not challenged on appeal, we need not list all of the allegations and responses here. A few illustrations, however, may be useful in understanding the nature of the present claims. For example, one of the unsafe practices Vivian alleges she faced was being denied a weight-lifting belt. Ball State explained that at the time Vivian first requested a weight-lifting belt, the university's health center was investigating which belts were the best ones to purchase for school employees. The belts did become available, and Vivian acknowledged receiving one. Vivian also claimed that she was subject to unsafe working conditions when she was instructed to tighten the knots of her climbing ropes before going up in a tree. DeWayne testified that Vivian was taught to tighten the knots before climbing for her own safety. She was told to do this so that, if she slipped while climbing and lost hold of the rope with her hands, something would prevent her from plummeting to the ground. No evidence was presented that Greg was instructed differently. Another example of improper conduct is that DeWayne instructed Vivian to use a chain saw with one hand, occasionally holding it over her head. The undisputed facts showed that, though this may have been risky, the risk was not imposed in a discriminatory manner. While reasonable people may differ on the wisdom of operating a chain saw with one hand, Vivian testified not only that she had been instructed to do so, but that Greg had done it that way, too. A last example of the disparate treatment claims was Vivian's allegation that Greg received more training than she did. This claim fell by the wayside when DeWayne produced his daily training log, which showed the number of hours of instruction each trainee received in different areas. The log demonstrated that there was no significant difference in the amount of training Greg and Vivian received, particular-

ly given the fact that Greg had been in the program three months longer than Vivian.

In her response to the university's motion for summary judgment, Vivian made no attempt to refute the explanations and evidence presented by the university in response to the disparate treatment claims. The district court entered summary judgment on all of the claims initially raised. While no attempt was made to resuscitate the disparate treatment claims, the response to Ball State's motion for summary judgment did raise additional claims of retaliation. These new allegations centered on evaluations by Wayne and DeWayne of Vivian's performance and on claims of changed conditions of employment.

These claims are in many ways intertwined; the existence of certain methods of performance valuation is one of the changed conditions of employment Vivian complains of. After Vivian entered the program, Wayne and DeWayne were instructed to keep records of the trainees' progress and activities. These records included a daily journal of trainee assignments and instructions, and written monthly evaluations. The evaluation forms listed a number of different job-related categories and asked the trainer to rate the trainee's performance in each category. There was a question which asked the supervisor whether the trainee's overall performance met expectations. There was also space for written comments. Follow-up meetings were held with the trainees to discuss the monthly evaluations, which employees were asked to sign as an indication of agreement. Annual evaluations also took place, and trainees were asked to complete written assessments of their own progress, identifying areas in which they felt they needed more training. An independent consultant was brought in at one time to test the trainees and evaluate their progress.

 Vivian claimed in her summary judgment response that the decision to institute more formal methods of evaluation constituted retaliation. She also claimed that since the time she joined the tree crew there has been an increased emphasis on tree climbing, allegedly for the purpose of driving her out of the program. With regard to her performance evaluations, Vivian alleged that later favorable evaluations were inconsistent with prior unfavorable ones; that unfavorable evaluations were inconsistent with DeWayne's deposition testimony; that a supervisor attended all of her evaluation meetings but few, if any, of Greg's; and that both she and Greg had difficulty with rope techniques but Greg's evaluations were favorable while hers were not. The district court entered summary judgment in favor of the university on the claims involving changed conditions of employment and the performance evaluations as well, and we review the grant *de novo*, drawing all reasonable inferences in favor of the nonmoving party. *Smith v. Shawnee Library Sys.*, 60 F.3d 317 (7th Cir.1995). In doing so, we apply the same standard as the district court; summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Jasper Cabinet Co. v. United Steelworkers of America*, 77 F.3d 1025 (7th Cir.1996).

The appeal before us addresses only the claims related to the negative performance evaluations. As the number of allegations has dwindled, however, the scope of the performance evaluation claim has expanded. The initial complaint, as we have said, alleged only disparate treatment. By the time the case was orally argued in this court, Vivian's performance evaluations were being characterized as a form of "probation."

 As we have mentioned, a plaintiff proceeding under the *McDonnell Douglas* burden-shifting method must first establish a prima facie case of retaliation. Only then does the burden shift to the defendant to provide nonretaliatory explanations for its actions. A prima facie case of retaliation is established when a plaintiff shows that: "1) she engaged in a protected activity under Title VII; 2) she suffered an adverse employment action subsequent to her participation; and 3) there exists a causal connection between the adverse employment action and her participation in protected activity." *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir.1995). There is no question here regarding the first element of the prima facie case. Vivian filed a complaint with the

EEOC—clearly a protected activity under Title VII. But she's a loser on the second element. And if there is no adverse employment action, the third element of the prima facie case is, of course, absent as well. The district court found that Vivian failed to demonstrate adverse employment action. The court went on to say that, even assuming the prima facie case was established, she had not shown that the nondiscriminatory reasons set forth by the university were pretextual.

■ Adverse employment action has been defined quite broadly in this circuit. *McDonnell v. Cisneros*, 84 F.3d 256, 258–59 (7th Cir. 1996). In some cases, for example when an employee is fired, or suffers a reduction in benefits or pay, it is clear that an employee has been the victim of an adverse employment action. But an employment action does not have to be so easily quantified to be considered adverse for our purposes. "[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir.1987). In *Collins* the employee was placed in a new department where her supervisors didn't even know what her job entailed. Her office was taken away from her, and she was assigned to a desk outside her supervisor's office, where a receptionist would typically sit. She also lost her phone, business cards, and listing in professional directories and publications. These changes were found to constitute adverse employment action. Likewise, in *Dahm v. Flynn*, 60 F.3d 253 (7th Cir.1994), we found that "a dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action...." *Dahm* at 257.[1]

■ While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that "an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). In *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132 (7th Cir.1993), we found that a change in title from assistant vice-president and manager of one branch of a bank to a loan officer position at a different branch did not by itself constitute an adverse employment action. Another case where adverse employment action was found to be absent is *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir.1989). In *Spring*, a 65–year–old school principal was offered the choice between retirement and transfer to a different school as part of a school district reorganization plan. The transfer would have afforded the principal a two-year contract and a merit pay increase, but she would have had to share the position with a co-principal. The court found that the "humiliation" she claimed the co-principal arrangement would cause did not constitute an adverse employment action because "public perceptions were not a term or condition of Spring's employment." *Spring* at 886. The only negative employment-related consequence of the transfer was found to be an increase in the distance she had to travel to work. This alone did not constitute an actionable adverse employer action. Likewise, in *Flaherty v. Gas Research Institute*, 31 F.3d 451 (7th Cir.1994), we found that a lateral transfer, where the employee's existing title would be changed and the employee would report to a former subordinate, may have caused a "bruised ego," but did not constitute an adverse employment action. Most recently, in *Williams*, we found that the strictly lateral transfer of a salesman from one division of a

---

1. A recent article on changing employment patterns in Japan provided too good an example of what we would consider adverse action to pass up. It seems a Japanese company was unwilling to fire a long-time employee, and the employee was unwilling to accept the suggestion that he retire. "So the company moved him to a bare desk in the corner of a factory and told him that every two weeks, he would have to turn in a report on the same topic: 'My Second Life.' " After six months he ran out of things to say, but was saved by a friend who gave him two books on insects and animals for inspiration. According to his friend, he is still writing. "When Lifetime Jobs Die Prematurely: Downsizing Comes to Japan, Fraying Old Workplace Ties," *New York Times*, June 12, 1996, p. C1.

pharmaceutical company to another was not an adverse employment action.

■ The dispositive question in our case is not whether Vivian's performance evaluations were undeservedly negative,[2] but whether even undeserved poor evaluations can alone constitute the second element of her prima facie case. If Vivian had been, as she alleges, put on probation, we might have a different case before us. But one thing is clear from the record—Vivian was never threatened with or put on probation. The "probation" line of argument seems to stem from two things: a supervisor's statement that Vivian's completion of the program might be delayed if she didn't master the necessary skills on time; and the district court's holding that unflattering evaluations do not alone constitute adverse action for purposes of Title VII. We learned at oral argument that she completed the training program on time and is currently working at Ball State as a full-fledged tree surgeon. The attempt to bolster Vivian's case by characterizing a trainee's need for training as "probation" fails.

There is little support for the argument that negative performance evaluations alone can constitute an adverse employment action. There are certainly cases where allegedly undeserved performance evaluations have been presented as evidence of discrimination on the basis of sex or age. But Vivian has not identified, nor have we discovered, a single case where adverse performance ratings alone were found to constitute adverse action. Vivian relies primarily on two cases to support her argument: *Vergara v. Bentsen,* 868 F.Supp. 581 (S.D.N.Y.1994); and *Mead v. U.S. Fidelity & Guaranty Co.,* 442 F.Supp. 114 (D.Minn.1977). In neither of these cases were negative reviews the sole basis for a finding of adverse action. In *Vergara,* the court noted that the employer had given Vergara poor evaluations, had failed to notify her of these evaluations in contradiction of company policy and practice, and had removed much of her job responsibilities and perhaps denied her a return to

these responsibilities based in part on the poor evaluations. In *Mead,* the plaintiff was overloaded with work, deprived of assistance, and eventually fired after filing a charge of sex discrimination. A supervisor testified that, with the exception of one employee who came in late for five weeks in a row, the only employees she made negative reports on were Mead and two co-workers who had also filed EEOC charges. As if that weren't enough, a memo was discovered which in essence said, "Let's paper her file so we can get rid of her."

The closest thing to support for Vivian's claim we were able to find is a 1994 case, not cited by the parties, out of the Southern District of Florida. There, the court said, "An allegation that false performance evaluations were prepared in retaliation for the filing of an EEOC claim is a recognized cause of action...." *Boyd v. Brookstone Corp. of New Hampshire, Inc.,* 857 F.Supp. 1568, 1571 (S.D.Fla.1994). Turning to the cases cited by the Florida court in support of that proposition, we see that in one of them the negative evaluations were accompanied by a demotion, *EEOC v. Reichhold Chemicals, Inc.,* 988 F.2d 1564 (11th Cir.1993). In another, the retaliatory conduct included not only poor reviews, but a transfer of job responsibilities to the point where the employee's work became the intellectual equivalent of a "dunce cap," *Sowers v. Kemira, Inc.,* 701 F.Supp. 809, 825 (S.D.Ga.1988). In none of them were evaluations alone found sufficient to constitute adverse action.

Looking to the facts of the case before us, in the light most favorable to Vivian, we can only conclude that the evaluations alone do not constitute an actionable adverse employment action on the part of Ball State. Vivian was in training, and the evaluations were characteristic of a structured training program. They were facially neutral tools designed to identify strengths and weaknesses in order to further the learning process. Because we decline to extend the already broad definition of adverse employment action to include such evaluations, we conclude, as the

---

2. We note that there is considerable evidence that the evaluation forms were completed in good faith. Perhaps the most telling indication

of their honesty is a memo prepared by Vivian herself, which identifies areas where she felt she needed improvement.

district court did, that Vivian failed to make out a prima facie case of retaliation. The decision of the district court is affirmed.