In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2095

JUDITH HILT-DYSON,

Plaintiff-Appellant,

v.

CITY OF CHICAGO,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 6307--James F. Holderman, Judge.

ARGUED DECEMBER 5, 2001--DECIDED February 27, 2002

   Before COFFEY, RIPPLE and Diane P. WOOD,
Circuit Judges.

   RIPPLE, Circuit Judge.  Judith Hilt-
Dyson, an officer with the Chicago Police
Department ("CPD"), filed this action
against the City of Chicago ("the City")
alleging that the conduct of her
supervisor, Lieutenant William
Sutherland, constituted sexual harassment
in violation of Title VII. Ms. Hilt-Dyson
also alleged that Sutherland retaliated
against her for reporting his purported
discriminatory conduct to the CPD. The
district court entered summary judgment
for the City on both claims. For the
reasons set forth in the following
opinion, we affirm the judgment of the
district court.

I

BACKGROUND

A.  Facts

   In 1998, the CPD stationed Ms. Hilt-
Dyson, a female police officer, in its
Evidence and Recovered Property Section
("ERPS"). Operating in a caged area with
four vaults and several offices, the ERPS
functions as a repository for confiscated
property including narcotics and weapons.
In February 1998, the CPD appointed
Lieutenant William Sutherland as the

commanding officer of the ERPS.

On March 24, 1999, Sutherland approached Ms. Hilt-Dyson as she worked on a computer located in the ERPS. He rubbed the middle of her back with his left hand. Sutherland then slid his left hand to Ms. Hilt-Dyson's right shoulder and squeezed it. The contact between Ms. Hilt-Dyson and Sutherland lasted less than a minute. A third officer, Walter Bland, was present during this incident. On the following day, March 25, 1999, while Ms. Hilt-Dyson ate lunch with several of her co-workers in the ERPS' mail room, Sutherland approached her. Once again, Sutherland rubbed the middle of Ms. Hilt-Dyson's back and touched her shoulder./1 After Sutherland removed his hand from Ms. Hilt-Dyson, she addressed him and stated, "Lieutenant, you like touching me." R.27 at 9. Sutherland denied his subordinate's accusation and contended that he merely was trying to get her attention. When Ms. Hilt-Dyson indicated her disapproval of the contact, Sutherland stated, "I won't touch you anymore." R.27 at 9. After these two incidents, Sutherland never touched Ms. Hilt-Dyson again.

On March 26, 1999, Ms. Hilt-Dyson filed a "To-From Report" with the CPD in which she contended that Sutherland's actions constituted sexual harassment. Pursuant to department regulations, the CPD's Office of Professional Standards ("OPS") began an investigation into the two incidents. The OPS sustained Ms. Hilt-Dyson's complaint with regard to the March 25 contact and recommended a suspension for Sutherland. Upon reviewing the case, CPD officials disagreed; they concluded that the complaint was not sustained/2 and overruled the determination of the OPS.

In May 1999, two months after the back rubbing incidents, the CPD directed unit commanding officers--including Sutherland--to conduct an inspection of their subordinates' spring dress uniforms. During an inspection, the commander seeks to ensure that his subordinates' uniforms fit properly, comply with CPD standards and are not worn out. Moreover, in the ERPS, the commanding officer attempts to conduct the inspection in such a manner as to enable members of the division to return

to work as quickly as possible.

On May 6, 1999, Sutherland complied with the CPD's order and reviewed simultaneously the uniforms of his four subordinates--including Ms. Hilt-Dyson. Because of limited space in the ERPS, Sutherland held the inspection in the hallway adjacent to the division's administrative offices. His four subordinates formed a line in the hallway. Although Ms. Hilt-Dyson occupied the second position in this line, Sutherland reviewed her uniform first./3 According to Ms. Hilt-Dyson, Sutherland stared at her chest during the inspection. He then informed Ms. Hilt-Dyson that her uniform blazer fit too snugly; he ordered her to raise her arms. After the inspection, a male officer described this latter order as demeaning. During previous inspections, however, Sutherland, as well as other commanders, had required male and female officers to lift their arms to determine if their blazers fit properly./4 Continuing with the inspection, Sutherland asked Ms. Hilt-Dyson to remove her uniform hat; he noted deficiencies in the condition of the hat including scratches on the brim as well as a dull shield. He next ordered Ms. Hilt-Dyson to open her blazer. After inspecting Ms. Hilt-Dyson's service revolver, Sutherland told Ms. Hilt-Dyson to correct the problems with her uniform and then dismissed her from the inspection. Shortly after the inspection, Ms. Hilt-Dyson ordered a new blazer, uniform hat and shield. Sutherland did not touch Ms. Hilt-Dyson in any manner during the inspection.

Ms. Hilt-Dyson promptly requested that the CPD initiate a Complaint Register ("CR") against Sutherland. Specifically, she alleged that the orders directing her to raise her arms and remove her hat during the inspection constituted sexual harassment. The OPS agreed and recommended that the CPD suspend Sutherland for two days. Upon reviewing this determination, CPD officials disagreed with the OPS' findings and concluded that the complaint was not sus tained.

Six months after the inspections--January 8, 2000--an incident occurred between Ms. Hilt-Dyson and a fellow officer, Ellen Rake. According to Ms.

Hilt-Dyson, Rake became involved in a verbal dispute with a CPD property custodian over the possible location of a missing item. Rake called for Ms. Hilt-Dyson and inquired whether anyone had recovered the item during Ms. Hilt-Dyson's shift. After approaching Rake, Ms. Hilt-Dyson contends that she briefly touched Rake's elbow and then immediately apologized for the contact./5

Immediately after the incident, Sutherland met with both officers in his office. He inquired whether Rake wished to file an Injury on Duty ("IOD") report and to initiate a CR against Ms. Hilt-Dyson. Rake initially declined this invitation. However, while gathering paper to write a To-From Report on the incident, Rake experienced tenderness in her back. Because she had a preexisting back injury, Rake believed that she needed "to cover" herself and thus requested that an IOD report be completed./6

Once Rake requested the IOD report, a CR had to be initiated against Ms. Hilt-Dyson pursuant to CPD regulations. According to Ms. Hilt-Dyson, Rake approached her shortly after requesting the IOD and stated, "He [Sutherland] told me I have to get a CR number." R.27 at 23. After investigating the complaint, the OPS recommended that the CPD suspend Ms. Hilt-Dyson for seven days. A review panel, however, disagreed; it concluded that it could not sustain the allegation that Ms. Hilt-Dyson had intentionally touched Rake.

B. District Court Proceedings

1.

On September 24, 1999, Ms. Hilt-Dyson filed this action against the City in the district court. She alleged that Sutherland had subjected her to sexual harassment in violation of Title VII. In particular, she claimed that the back rubbing incidents as well as the uniform inspection created a hostile work environment in the ERPS. Ms. Hilt-Dyson further submitted that Sutherland retaliated against her because she had reported his alleged discriminatory conduct to the CPD. Specifically, Ms. Hilt-Dyson contended that Sutherland retaliated by the manner in which he con

ducted the inspection and by ordering Rake to file a false complaint--the CR--against her.

The City moved for summary judgment on Ms. Hilt-Dyson's hostile work environment and retaliation claims. In particular, the City submitted that Sutherland's alleged discriminatory conduct was not sufficiently severe or pervasive to constitute sexual harassment as that term is employed under Title VII. The City emphasized that Sutherland's alleged harassment involved isolated incidents that were neither egregious nor pervasive. Turning to the claim of retaliation, the City noted that the inspection procedure required that the commanding officer inspect the fit of the officers' blazer and that the procedure employed by Sutherland was the one employed on other occasions. The City further argued that the CPD regulations required the filing of the CR against Ms. Hilt-Dyson after the incident with Rake. Accordingly, the City submitted that the CR could not have been filed to retaliate against Ms. Hilt-Dyson.

In response, Ms. Hilt-Dyson submitted that, when viewing the facts in the light most favorable to her, a reasonable jury could conclude that Sutherland's conduct constituted sexual harassment. In particular, she argued that the back rubbing incidents coupled with the uniform inspection created a hostile work environment. Finally, Ms. Hilt-Dyson argued that she had alleged sufficient facts to indicate that Sutherland had ordered Rake to file a false complaint against her.

2.

The district court entered summary judgment for the City. It concluded that Ms. Hilt-Dyson could not demonstrate that an objectively reasonable person would have found her working conditions hostile. In particular, the back rubbing incidents and the uniform inspection were isolated occurrences. According to the district court, a reasonable person would not perceive these events to be so abusive or hostile as to amount to sexual harassment.

Similarly, the district court rejected Ms. Hilt-Dyson's claims of retaliation.

According to the district court, Ms. Hilt-Dyson failed to establish a prima facie case of retaliation concerning Sutherland's inspection of her uniform. In particular, she could not demonstrate how the inspection amounted to an adverse employment action. As for her other claim of retaliation--the filing of the CR against her--the court concluded that City had a legitimate reason for its actions. CPD regulations required the filing of the CR once Rake filed the IOD report. Therefore, concluded the court, the CR had not been filed to retaliate against Hilt-Dyson for her complaints against Sutherland.

## II

## DISCUSSION

### A.

We review de novo the district court's grant of summary judgment. See Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1136 (7th Cir. 2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court's function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We must ask whether "there are genuine factual issues that can properly be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. In assessing whether a genuine issue of material fact exists, we must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. See id. at 255; Basith v. Cook County, 241 F.3d 919, 926 (7th Cir. 2001).

### B.

Ms. Hilt-Dyson submits that Sutherland's conduct created a hostile work environment at ERPS and thus constituted sexual harassment in violation of Title VII. To maintain an actionable claim

under this theory, an employee must demonstrate that her co-worker or supervisor harassed her because of her sex. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). In addition, this harassment must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). Moreover, a hostile work environment is one that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787; Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000). In determining whether contested conduct actually creates an objectively hostile work environment, a number of factors may be considered including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher, 524 U.S. at 787–88; Hostetler, 218 F.3d at 806. Moreover, the alleged discriminatory conduct cannot be considered in a vacuum; rather, an em ployee's claim must be evaluated in light of the social context in which events occurred. See Oncale, 523 U.S. at 82.

Simply put, Title VII does not prohibit all verbal or physical harassment in the workplace. See Oncale, 523 U.S. at 81. Although a bright line does not exist separating innocuous from actionable behavior, this court has noted that isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment. See Koelsch v. Beltone Elecs. Corp., 46 F.3d 705, 708 (7th Cir. 1995). "[T]he occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create a work environment that a reasonable person would find intolerable. Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995). A limited number of incidents, however, does not preclude necessarily a trial on a sexual harassment claim. On several occasions, we have reversed the grant of summary

judgment for a defendant on a sexual harassment claim despite the fact that the employee alleged relatively few incidents of objectionable conduct. See, e.g., Hostetler, 218 F.3d at 809 (fellow employee not only forcibly kissed plaintiff but later cornered plaintiff and attempted to remove her brassiere); Smith v. Sheahan, 189 F.3d 529, 532 (7th Cir. 1999) (fellow employee physically assaulted plaintiff and had history of verbally abusing female co-workers). In these cases, however, the objectionable conduct, even though isolated, proved so severe as to create potentially a hostile work environment for the employee.

We must assess whether Ms. Hilt-Dyson has alleged an actionable claim of a hostile work environment due to sexual harassment. It is clear from the record that Ms. Hilt-Dyson subjectively considered her work environment to be hostile and abusive. In deposition testimony, Ms. Hilt-Dyson stated that she felt violated after Sutherland touched her back on two occasions. She further indicated that she found these back rubbing incidents demeaning and degrading. The City, in fact, concedes that Ms. Hilt-Dyson perceived her work environment as hostile.

Despite Ms. Hilt-Dyson's subjective perceptions concerning ERPS, an objective person would not view her work environment as hostile or abusive. In particular, the back rubbing incidents at issue in this case, although inappropriate behavior in the workplace, do not constitute by themselves actionable harassment under Title VII. Sutherland, her supervisor, rubbed her back on two occasions in March 1999. On each occasion, the back rubbing incident was brief and involved no threats, intimidation or humiliation. Moreover, upon learning that this conduct troubled Ms. Hilt-Dyson, Sutherland told her that he would not touch her again. Indeed, the parties agree that Sutherland never touched nor attempted to touch Ms. Hilt-Dyson after the second back rubbing incident. Given these circumstances, the back rubbing incidents did not constitute actionable sexual harassment under Title VII.

Ms. Hilt-Dyson also submits that the uniform inspection could lead a

reasonable juror to conclude that she had been subjected to sexual harassment in violation of Title VII. Ms. Hilt-Dyson contends that, during the inspection, Sutherland stared at her chest and required her to raise her arms. She also contends that he inspected her hat and revolver in an effort to harass and humiliate her.

Ms. Hilt-Dyson subjectively considered the incident severe enough to create a hostile work environment. In arguing that a reasonable juror would reach the same assessment when evaluating the event objectively, she relies on her own account of the inspection and the statement of another officer that, in his opinion, the lieutenant's order that she raise her hands over her head constituted a "demeaning order." R.27, Ex.4. As noted earlier, we cannot divorce conduct from the context in which it occurred. Sutherland did not order Ms. Hilt-Dyson to lift her arms and to turn over her hat for inspection during a routine workday. To the contrary, the directions were given as part of a uniform inspection--an event that by its nature involves scrutiny of an officer's clothing and equipment in an effort to ensure that the CPD's officers meet uniform requirements and are prepared to fulfill their responsibilities. In this context, inspection of gun belts and uniform caps, as well as increased scrutiny of a subordinate's blazer, may serve a legitimate purpose. Discipline in police departments is quasi-military in nature and sworn officers expect to participate in inspections, drills and other activities that create superior-subordinate encounters not found in civilian occupations. Many of these encounters, especially inspections, are often unpleasant and, in the eyes of the subordinate, demeaning. On the other hand, those in authority in such organizations still have the obligation, within the context of the legitimate demands imposed by their responsibilities, to comply fully with the law protecting the civil rights of their subordinates. The inspection process neither gives a commanding officer license to leer at the chest of a female subordinate nor the authority to single out a female officer for increased scrutiny because of her sex. Mindful of our obligation to assess the record in

the light most favorable to Ms. Hilt-Dyson, it is indeed a close call as to whether the record would support a determination that Sutherland's actions during the inspection can be characterized as an effort to demean her on account of her sex. We need not decide the issue definitively, however, because, even if we were to accept Ms. Hilt-Dyson's assessment of the situation, we could not conclude that the incident was so severe or pervasive as to constitute sexual harassment.

Even when considering the uniform inspection in conjunction with the early incidents, Ms. Hilt-Dyson's claim cannot survive summary judgment. The back rubbing incidents were simply insufficient to state a claim for hostile work environment sexual harassment. Coupling these events with the uniform inspection does not create a sufficient inference of a hostile work environment at the ERPS to survive summary judgment. We must therefore conclude that the district court properly entered summary judgment on Ms. Hilt-Dyson's sexual harassment claim.

C.

Finally, we turn to Ms. Hilt-Dyson's contention that Sutherland retaliated against her for reporting his alleged discriminatory activity to the CPD. Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under the statute. See 42 U.S.C. sec. 2000e-3(a). To demonstrate that an employer has violated this provision of Title VII, an employee may present either direct or indirect evidence of the employer's retaliatory intent. Direct evidence, however, frequently does not exist in these cases. As such, most employees attempt to satisfy their burden through the indirect method of proof.

Under this indirect methodology, an employee must first present evidence sufficient to establish a prima facie case that her employer retaliated against her in violation of Title VII. More precisely, an employee must demonstrate

that: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. See Stone v. City of Indianapolis Pub. Utils. Div., No. 01-3210, 2002 WL 234239, at *1 (7th Cir. Feb. 19, 2002). Absent direct evidence of retaliation, failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim. Once the employee succeeds in proving her prima facie case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. See Stone, 2002 WL 234239, at *3; Aviles v. Cornell Forge Co., 241 F.3d 589, 592 (7th Cir. 2001). Once the employer has done so, the burden of production shifts back to the plaintiff to demonstrate the pretextual nature of the proffered reason. See Stone, 2002 WL 234239, at *3; Aviles, 241 F.3d at 592. At this point, if the employee fails to establish pretext, her retaliation claim cannot survive summary judgment.

1.

Ms. Hilt-Dyson first contends that the manner in which Sutherland inspected her uniform constituted actionable retaliation under Title VII. Because Ms. Hilt-Dyson does not offer any direct evidence of retaliatory intent, she proceeds under the indirect method of proof. As we noted earlier, the inability to prove even a single element of the prima facie case proves fatal to a retaliation claim.

We focus on the third prong of Ms. Hilt-Dyson's prima facie case--whether the uniform inspection constitutes an adverse employment action. As Ms. Hilt-Dyson aptly notes, this court has adopted a broad definition of the phrase "adverse employment action." See Oest v. Ill. Dep't of Corr., 240 F.3d 605, 612 (7th Cir. 2001) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). An adverse employment action is one that is materially adverse, "meaning more than a mere inconvenience or an alteration of

job responsibilities." Id. (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). Although creating a precise list of activities that constitute adverse employment actions would be impossible because of the unique circumstances of individual cases, we have indicated that materially adverse actions may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Ribando v. United Airlines, Inc., 200 F.3d 507, 510 (7th Cir. 1999). We have emphasized that an adverse employment action need not be quantifiable in terms of pay or benefits. See Smart, 89 F.3d at 441. At the same time, though, "not everything that makes an employee unhappy is an actionable adverse action." Id.

Upon reviewing the record in this case, we conclude that the uniform inspection did not constitute an adverse employment action. In large measure, Ms. Hilt-Dyson contends that the uniform inspection not only embarrassed her but also amounted to harassment. Conditions of employment designed to harass and humiliate an employee because she is a member of one of Title VII's protected classes may constitute an adverse employment action. See Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000). However, the harassing conduct must be actionable harassment--severe or pervasive--before it will be considered an adverse employment action. See id. at 1002 (citing North v. Madison Area Ass'n for Retarded Citizens-Developmental Ctrs. Corp., 844 F.2d 401, 409 (7th Cir. 1988) for the proposition that harassment must be "severe or pervasive" to be actionable under Title VII). In essence, then, this aspect of Ms. Hilt-Dyson's claim of retaliation overlaps with her claim of sex based discrimination. We have already concluded that, under Title VII, Sutherland's conduct during the inspection was not severe enough to constitute actionable sexual harassment. Under our case law, it follows that any harassment or humiliation Ms. Hilt-Dyson suffered during the inspection was not severe enough to constitute an adverse employment action.

Moreover, on numerous occasions, we have stated that negative evaluations, standing alone, do not constitute adverse employment actions. See Grube v. Lau Indus., Inc., 257 F.3d 723, 729 (7th Cir. 2001); Oest, 240 F.3d at 613; Ribando, 200 F.3d at 511. Sutherland's critique of Ms. Hilt-Dyson's blazer and uniform hat falls within this general rule. Ms. Hilt-Dyson does not contend that this evaluation triggered a reduction in pay or a diminution in job responsibilities. Although Ms. Hilt-Dyson ordered a new blazer and shield after the inspection, she does not submit that these purchases amounted to an adverse employment action. Simply put, this inspection did not constitute an adverse employment action. Thus, the district court properly entered summary judgment on this portion of Ms. Hilt-Dyson's retaliation claim.

2.

Ms. Hilt-Dyson also contends that the CR filed against her in January 2000 constitutes actionable retaliation. More precisely, Ms. Hilt-Dyson submits that Sutherland ordered Rake to file a false complaint--the CR--against her. We shall assume, without deciding, that Ms. Hilt-Dyson is able to establish a prima facie case of retaliation. See, e.g., Debs v. Northeastern Ill. Univ., 153 F.3d 390, 397 (7th Cir. 1998). The burden shifts to the City to articulate a legitimate, non discriminatory reason for the initiation of the CR against Ms. Hilt-Dyson. If an officer files an IOD report because she has been injured due to the conduct of a fellow officer, CPD regulations require the initiation of a CR against the officer who caused the injury. In this case, the parties agree that once Rake submitted an IOD report, a CR had to be initiated against Ms. Hilt-Dyson. The City, then, has proffered a legitimate, nondiscriminatory reason for the filing of the CR against Ms. Hilt-Dyson.

Because the City has met its burden of production, Ms. Hilt-Dyson may survive summary judgment only if she demonstrates the pretextual nature of this proffered explanation. She, however, has failed to meet her burden. It is clear the parties dispute the extent of the altercation that occurred between Ms. Hilt-Dyson and Rake. However, this particular factual

dispute is neither material to this action nor indicative of pretext. Rake's deposition testimony unequivocally indicates that she filed the IOD "to cover" herself because she had a preexisting back injury. Regardless of whether Ms. Hilt-Dyson tapped Rake's arm or pulled Rake across ERPS, Rake clearly felt the contact warranted the IOD report. Although the record is equivocal about whether Rake asked her sergeant or Sutherland to initiate an IOD report on her behalf, this lack of clarity is also immaterial. In her deposition, Rake indicated that she, of her own volition, requested the IOD report. Whether she approached Sutherland or her sergeant to initiate the process does not change the fact that she alone made the determination to obtain the IOD report. Once she made this request, department regulations required the filing of a CR against Ms. Hilt-Dyson.

Ms. Hilt-Dyson's primary challenge to this evidence is a statement Rake allegedly made on January 8. According to Ms. Hilt-Dyson, Rake stated "He [Sutherland] told me I have to get a CR number." R.27 at 23. The district court refused to consider the statement on the grounds that it was hearsay. We cannot accept Ms. Hilt-Dyson's submission on appeal that the statement is admissible as an excited utterance. More fundamentally, although this statement may indicate displeasure with filing the CR, it has no bearing on whether Rake, of her own volition, initiated the request for an IOD report. Because Ms. Hilt-Dyson has failed to establish pretext, the district court properly entered summary judgment on this portion of her claim./7

Conclusion

We conclude that none of Ms. Hilt-Dyson's claims present a genuine issue of triable fact. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

FOOTNOTES

/1 Sutherland contends that he merely tapped Ms. Hilt-Dyson on her shoulder because he wanted to say goodnight to her before he left.

/2 A finding of "not sustained" means that the CPD

concluded that insufficient evidence existed to prove or disprove an allegation.

/3 During the inspection, Ms. Hilt-Dyson wore a blazer, sometimes referred to as a "blouse" by the CPD. Underneath the blazer, Ms. Hilt-Dyson wore her uniform shirt as well as a gun belt that held her service revolver as well as other equipment.

/4 A commander asks an officer to raise his arms to assess the officer's range of motion--particularly, his ability to draw his weapon from underneath the blazer. See R.24 at 10 (Defendant's Statement of Undisputed Material Facts); R.27 at 12 (Plaintiff's Local Rule 56.1(B) Statement).

/5 Rake disputes this version of events. According to Rake, Ms. Hilt-Dyson entered the room, spun Rake around and then forcibly pulled Rake several feet. Although a fellow officer corroborates Rake's account, Ms. Hilt-Dyson contends that this officer was not present during the incident.

/6 It is unclear to whom precisely Rake made this request. Sutherland states that Rake approached him concerning the IOD Report and he, in turn, relayed the request to Sergeant Victor Mitkal. Rake submits that she approached Mitkal directly. In deposition testimony, Mitkal stated that Sutherland, at the direction of Rake, requested the completion of an IOD Report.

/7 Ms. Hilt-Dyson also submitted that the filing of the CR constituted actionable sexual harassment. However, as the analysis indicates, the CR was filed for a legitimate, nondiscriminatory reason. As such, the CR, even if considered with the uniform inspection and the back rubbing incidents, would not give rise to a claim for sexual harassment.