# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-1909

CYNTHIA FIRESTINE,

*Plaintiff-Appellant*,

v.

PARKVIEW HEALTH SYSTEM, INC.,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:01-CV-0414—**William C. Lee**, *Judge.*

_____

ARGUED DECEMBER 17, 2003—DECIDED JUNE 10, 2004
PUBLISHED OCTOBER 22, 2004[*]

_____

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Cynthia Firestine sued Parkview Health System, Inc., under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17, alleging that the company retaliated against her by removing her from her position for complaining about religious discrimination.

_____

[*] This decision was originally released as an unpublished order. In response to a motion from Firestine to publish, it is now issued as an opinion.

The district court granted summary judgment in favor of Parkview, concluding that Firestine could not establish that she had engaged in protected activity and, alternatively, had no evidence that Parkview's stated, non-discriminatory reason for removing her from her position was pretextual. Because we conclude that there are genuine issues of material fact about whether Parkview retaliated against Firestine, we reverse the district court's grant of summary judgment and remand for further proceedings.

## I.    Background

Taking all facts and inferences in favor of Firestine, *see Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002), we recount the relevant events leading up to her termination from Parkview. Firestine had worked as an administrative secretary in the medical/oncology/nursing department at Parkview since May 1998. After working as a manager in that department, Janette Bowers in March 2001 became Firestine's immediate supervisor.

Firestine often talked about her conversion to Catholicism with friends at work, including Bowers, former supervisor Lynn Gerig, and Karen Slabaugh. Firestine would also tell Bowers and Gerig when she was attending the Catholic Mass offered by Parkview during lunch about once a week. In response Bowers allegedly would roll her eyes. According to Firestine, in December 2000 Bowers shared with Firestine that she had once been Catholic. In the same conversation, both Bowers and Gerig warned Firestine that if she sent her son to Catholic school he would become "brainwashed," and Bowers said that he would "feel guilty about everything he does for the rest of his life."

At some point before November 2000, Firestine discovered through conversations with Slabaugh that Bowers was a lesbian and later confirmed that information with Bowers. After learning about Bowers's sexual orientation, Firestine

shared with Bowers that her Catholic beliefs kept her from approving of Bowers's lifestyle, but that her views did not affect her friendship with Bowers.

Believing her coworkers' comments about Catholicism to have been made in the context of friendship, Firestine never complained at the time to Human Resources about religious discrimination. But after receiving her first performance evaluation from Bowers on March 13, 2001, Firestine's outlook changed. Bowers had conducted the performance evaluation two weeks after becoming Firestine's supervisor with no input from Firestine's former supervisor, Gerig. Although the numerical rating, which affects merit raises, actually increased from the previous year (resulting in a two percent merit raise), Firestine took issue with comments about her job performance that she thought harsh and inaccurate. She feared that the comments could possibly affect future attempts to advance at Parkview. In particular, Firestine disagreed with Bowers's admonishment "to be continually aware of the need for confidentiality and to maintain a quiet and professional manner in patient care areas." The evaluation also contained some criticism about Firestine's ability to prioritize and timely complete tasks, such as filing.

Bowers and Cassie Carney, another manager in the department, presented the evaluation to Firestine on March 13, 2001. Firestine was extremely upset about the evaluation and requested to talk further about it with Bowers. Bowers agreed, but insisted that Carney should be present as well, which Firestine says made her "feel ganged up on." According to Firestine, at this second meeting on the morning of March 14, Bowers attempted to explain some of the comments but got upset when she realized that Firestine was taking notes.

Immediately after this meeting Firestine contacted Kari Vanness, an Employee Relations Specialist. Firestine maintains that she told Vanness that the only reason she could

discern for the harsh comments was that she was Catholic, and Bowers knew that as a Catholic she did not approve of homosexual lifestyles. Vanness told Firestine that she would look into the comments. Although Vanness normally maintains records on investigations into employees' complaints, she had none regarding Firestine's complaint of religious discrimination.

After meeting with Vanness, Firestine contacted a doctor treating her for depression to schedule an emergency therapy session around 12:30 p.m. that afternoon. Bowers, and Bowers's supervisor, Eileen Bracket, however, asked to meet with Firestine about her concern over her evaluation at 12:15 p.m. Feeling "cornered" and in need of seeing her doctor, Firestine sobbed uncontrollably throughout the meeting, causing Brackett to ask her why she was so upset about a positive evaluation. Finally, they allowed Firestine to leave the meeting in order to attend the doctor's appointment. Afterward Vanness spoke with Bowers about modifying the comments and Bowers agreed to do so. To ensure a fair evaluation, Bowers also asked Brackett to conduct a second review of Firestine.

Firestine's doctor, after seeing her that day, placed her on a two-week leave due to her emotional state. That night, Firestine spoke with coworker Slabaugh by telephone about her evaluation. Firestine told Slabaugh that the only reason she could think of for Bowers's negative comments was "that I'm a Catholic and Catholics do not believe in gay lifestyles, and due to her past comments about my Catholicism and her problems with Catholicism." According to Slabaugh, Firestine mentioned bringing legal action against Parkview, but Firestine denies this.

After the conversation Slabaugh told Bowers that Firestine believed she had received a bad evaluation because Bowers was prejudiced against Firestine for her Catholic beliefs about sexual orientation, and that Firestine planned to take

legal action. Bowers then contacted Vanness and Jon Dortch, the Vice President of Human Resources, to discuss, in Bowers's words, "the lesbian issue, and the Catholic issue, and the money amount." Bowers also met with Brackett to inform her about Firestine's conversation with Slabaugh (although Brackett recalls hearing only about the sexual orientation issue, not Firestine's related comment about religious discrimination). Brackett, after having seen Firestine and Bowers interact during the meeting on March 14 and now hearing of Firestine's comments about Bowers's sexual orientation, called Dortch and, she says, told him to move Firestine from her position. But Dortch does not remember this call.

Bowers, Vanness, and Dortch met, focusing their discussion on Firestine's comments to Slabaugh about Bowers's sexual orientation and not the "Catholic issue." Parkview has a policy that forbids negative comments about another's sexual orientation, as well as race, color, gender, religion, national origin, age, and disability, and makes such comments a dischargeable offense. The three discussed whether Firestine had violated that policy in conversing with Slabaugh by telephone concerning her belief that, Bowers, because she was a lesbian, had discriminated against Firestine for her Catholic views about sexual orientation. Vanness then set up a time to talk to Firestine upon her return from leave.

Firestine received an order directing her to report to Human Resources on March 28, 2001, the day she returned to work. At that time Vanness met with Firestine to discuss her after-hours conversation with Slabaugh. Firestine explained that she had simply communicated her belief that Bowers had discriminated against her and why. Vanness, though, replied that Bowers was angry about the comment to Slabaugh concerning her sexual orientation and "does not want to work with you anymore." According to Firestine, Vanness said, "It would be best to move you somewhere

else, so that you can better your career." Although Firestine insists that Vanness told her that she could no longer work under Bowers, Vanness asserts that Firestine opted to be removed from the department in order to resolve the situation.

Parkview arranged to move Firestine internally. Firestine was given 30 days to find another position at Parkview with the help of the recruiting department, which was the standard method of transferring current employees without positions for whatever reason. In addition, Firestine was to receive two weeks' pay while she looked for a replacement job; after that she would have to use her vacation time for the remainder of the 30-day period. Vanness took Firestine to meet Eric Weeks, an internal recruiter, who would assist her internal job search. According to Weeks, an employee is responsible for maintaining contact with him. Firestine had difficulty reaching Weeks by phone (although he did return her emails), and he showed her only lesser-paying, part-time jobs or full-time jobs in the evening, which were not comparable to her former employment. Furthermore, although Parkview had a website where new job openings were to be posted, the postings were not kept current, so Firestine did not find the website useful. But Parkview did post a hard copy of current job postings at each Parkview facility. After an April 5 email to him, Firestine did not contact Weeks again.

On April 15, 2001, still within the 30-day period but presumably a couple of days into her vacation time, Firestine found an external job at United Art and Education for $9.00 per hour. In responding to Parkview's motion for summary judgment, Firestine's counsel represented that this job paid less than Firestine's former position. There is no evidence about Firestine's salary at Parkview, although the person who replaced her there was paid $10.92 per hour. Parkview officially terminated Firestine on May 10, 2001, several weeks after the 30-day period, since she had not secured another

job at Parkview. Parkview, however, did not dispute Firestine's assertion at oral argument that no comparable jobs ever became available before that time.

Firestine filed a charge with the Equal Employment Opportunity Commission alleging religious discrimination and retaliation. In August 2001 she received her right-to-sue letter from the EEOC and then timely filed this action. Before summary judgment Firestine voluntarily dismissed her discrimination claim; only her retaliation claim remained. The district court granted summary judgment for Parkview on that claim, reasoning that Firestine could not establish the first step of her prima facie case—engaging in a protected activity—and that she also lacked evidence of pretext.

## II. Analysis

Firestine proceeded under the indirect method of establishing retaliation, which required first that she present evidence sufficient to establish a prima facie case that Parkview retaliated against her. *Hilt-Dyson*, 282 F.3d at 465. For a prima facie case, the plaintiff must demonstrate that (1) she engaged in statutorily protected activity, (2) she was performing her job according to her employer's legitimate expectations, (3) despite meeting those expectations, she suffered a materially adverse action, and (4) she was treated worse than a similarly situated employee who did not engage in statutorily protected activity. *Id.*; *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If a prima facie case is established, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004); *Hilt-Dyson*, 282 F.3d at 465. Once the defendant has provided a legitimate reason, the burden

shifts back to the plaintiff to show that the proffered reason is pretextual. *Hilt-Dyson*, 282 F.3d at 465.

On appeal Firestine first correctly argues that the district court erred in finding that she did not engage in statutorily protected activity. According to Firestine, her complaint to Vanness about what she reasonably believed to be religious discriminatory animus by Bowers satisfied the first step of the prima facie case. In order to establish that she had engaged in a protected activity, Firestine was required to demonstrate that she complained about an act that she " 'reasonably believed in good faith . . . violated Title VII.' " *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (quoting *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir. 1994)); *see Dey v. Colt. Constr. & Dev. Co.*, 28 F.3d 1446, 1457-58 (7th Cir. 1994). Only a groundless claim "resting on facts that no reasonable person possibly could have construed as a case of discrimination" could not constitute a statutorily protected activity. *Fine*, 305 F.3d at 752. And a mistake as to the merits of a complaint does not cost an employee the protection of Title VII. *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004).

In finding that Firestine did not engage in statutorily protected activity, the district court first expressed doubt about the good faith of her belief that Bowers had discriminated against her because, in the court's view, the evaluation that sparked the subsequent events was positive. Firestine, however, focuses on the comments in the evaluation, particularly the admonition to show greater awareness of the need for confidentiality. Parkview, for its part, did not present any evidence about how the evaluations are used and their effect on advancement. Nor did Parkview dispute Firestine's statement that the suggestion she was not maintaining the confidentiality of patient information could doom advancement. Instead Parkview characterizes the evaluation as good, focusing on the numerical ranking, and asserts that the comments were valid. The validity of such

comments and their characterization, however, is disputed. When these disputes of fact exist, it is the role of the factfinder to determine whether Firestine believed in good faith that Bowers's comments stemmed from a discriminatory animus. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Relying on a statement in *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999), that "the objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law," the district court also reasoned that Firestine's belief was not reasonable because negative evaluations do not amount to adverse employment actions. But, even if the perceived act of discrimination does not "reach a level where it affects the terms and conditions of employment," the employee may have a valid retaliation claim if the employer fires her for complaining about that act. *Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000). Firestine did not need to establish a successful underlying Title VII claim to satisfy the first element of the prima facie case for a retaliation claim. *See Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (conduct at issue does not need to violate Title VII); *Alexander*, 40 F.3d at 195 (complained-of conduct need not violate Title VII). Even though negative evaluations cannot support a Title VII discrimination claim, *see, e.g.*, *Hilt-Dyson*, 282 F.3d at 466, the evidence established that Firestine reasonably believed she was complaining about an action in violation of Title VII based on Bowers's previous anti-Catholic comments and her allegedly negative comments in the evaluation just two weeks after she moved into a position to affect Firestine's job. *See Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (negative job evaluation may evidence discrimination); *Collins v. State of Ill.*, 830 F.2d 692, 702 (7th Cir. 1987) (holding that employee engaged in statutorily

protected activity when she complained that new supervisor's frequent, negative evaluations were racially motivated).

Parkview's characterization of Firestine's evaluation as "objectively positive," does, however, affect our analysis of whether Firestine was meeting Parkview's legitimate job expectations. According to Parkview, Firestine failed to meet its legitimate expectations only to the extent that after receiving her evaluation she commented on Bowers's sexual orientation in the course of complaining to coworker Slabaugh during an after-hours conversation about perceived discrimination. Because this position coincides with Parkview's proffered nondiscriminatory reason for removing Firestine, our later discussion about pretext covers analysis of the second step in the prima facie case. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001).

We turn then to the third prong of the prima facie case. Firestine argues that her removal from her job by itself constitutes an adverse action. She asserts that the offer of a 30-day window to transfer internally was a sham, exemplified by Parkview's failure to find her a comparable full-time job on the day shift. Transfers that quantitatively affect benefits or wages or that significantly reduce an employee's career prospects may constitute adverse action. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003); *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). And although Parkview directs its response to whether Firestine suffered an "adverse *job* action" (emphasis added), retaliatory conduct that can incur liability is not so limited in scope. *See Herrnreiter*, 315 F.3d at 746.

Here, the evidence established that Firestine suffered an adverse action—she was removed from her job, she had to use some of her vacation time to seek another position at Parkview, and ultimately the jobs made available to her paid less, involved entirely different work, and had less desirable hours. There is no dispute that these jobs were

not comparable. And although Firestine left before the 30-day window expired, Parkview never challenged Firestine's assertion at oral argument that no comparable jobs ever became available before the end of that period. Removing Firestine from her position and then providing her with the option of transferring only to jobs quantitatively and qualitatively worse than her former position was a materially adverse action. *Sitar*, 344 F.3d at 727 (explaining that whether transfer is adverse action depends on how disadvantageous the change is); *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) (holding that transfer that leads to reduction in pay or benefits is adverse action).

Firestine also satisfies the "similarly situated" prong of the prima facie case. Contrary to Parkview's contention in its summary judgment motion that Firestine needed to identify a non-Catholic employee who did not complain but was evaluated better than her, the proper comparison is whether a similarly situated employee, who did not complain about religious discrimination, was treated more favorably, i.e., not removed from his or her position. *See Stone*, 281 F.3d at 644. Parkview concedes in its brief that no other employee has complained of religious discrimination. And if by "similarly situated" Parkview means someone else who purportedly violated its policy against commenting on a coworker's sexual orientation, we think Parkview's characterization of its policy is disingenuous. The cited policy is actually broader: it forbids comments on a coworker's race, color, gender, religion, national identity, age, disability, or sexual orientation, and only because Parkview seeks to narrow the policy's scope can it insist that no others were similarly situated. Three such persons are obvious to us, and Parkview has never contended that any of them were disciplined, let alone removed from their jobs after their conduct came to light. Slabaugh, who previously had told Firestine of Bowers's sexual orientation, was not disciplined for violating the policy, nor was former supervisor Gerig or

Bowers herself disciplined after their earlier disparaging remarks about Firestine's Catholicism had been made known to Vanness.

And that brings us to pretext. In this case, whether Parkview actually viewed Firestine's after-hours conversation with Slabaugh as violating the policy forbidding negative comments against another's sexual orientation is a proposition sufficiently dubious to require resolution by the trier of fact. *See Gordon*, 246 F.3d at 888 (to establish pretext, plaintiff must demonstrate that employer's proffered reason was unworthy of belief). Although we do not stand as a superpersonnel department and the proffered reason must only be sincere, "a determination of whether a belief is honest is often conflated with analysis of reasonableness." *Id.* at 889 (internal quotations omitted). Based on the record, the conversation with Slabaugh mirrored Firestine's complaint to Vanness about possible workplace discrimination concerning whether Firestine's Catholic-based views on sexual orientation caused Bowers to give her a harsher evaluation. To view Firestine's speculation about Bowers's motivation as a negative comment *on her sexual orientation* and therefore in violation of the policy is not objectively reasonable, creating doubt as to the sincerity of Parkview's reason. Vanness's failure to keep written notes about Firestine's complaint and the investigation into her comments about Bowers's sexual orientation also undermine the credibility of Parkview's explanation for removing Firestine.

In addition, Parkview presents an inconsistent story. Parkview argues that Vanness and Dortch made the decision to remove Firestine for violating the anti-discrimination policy after learning of her conversation with Slabaugh. But Parkview was specifically asked in an interrogatory why it removed Firestine from her position, and in its response the company did not state that Firestine had violated a company policy. And Parkview added to its story again at

summary judgment, asserting alternatively that Brackett was the decisionmaker and had determined that Bowers and Firestine could not work together before Firestine's conversation with Slabaugh even occurred. Vanness, however, attested that she did not discuss the decision to remove Firestine with Brackett, and Dortch has no recollection of a conversation with Brackett taking place. Although Parkview argues that these various explanations are not contradictory, the testimony of Vanness and Dortch suggest otherwise. Parkview's competing explanations call into question their veracity. *See Gordon*, 246 F.3d at 891-92. With that in mind, we conclude that Firestine has raised a genuine issue of material fact as to the pretextual nature of Parkview's proffered explanation for removing her, requiring a trial to resolve.

III. Conclusion

For the foregoing reasons, we REVERSE the decision of the district court and REMAND for further proceedings.

A true Copy:

       Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*