(Slip Opinion)

# Religious Liberty Protections for Federal Employees in Light of Recent Legal Developments

President Clinton's 1997 Guidelines on Religious Exercise and Religious Expression in the Federal Workplace and Attorney General Sessions' 2017 Memorandum Regarding Federal Law Protections and Religious Liberty should largely be enforced according to their terms. Intervening case law demands two exceptions, namely that agencies should no longer apply (1) the "de minimis" standard for determining an undue hardship under Title VII, or (2) the "appearance of official endorsement" test for determining violations of the Establishment Clause.

President Trump's "Return to In-Person Work" directive does not preclude the appropriate use of situational telework as a form of religious accommodation.

September 18, 2025

MEMORANDUM OPINION FOR THE ACTING CHAIR,
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

You have asked us how recent changes in law affect the application of two prior pieces of guidance regarding religious liberty: Office of the Press Secretary, The White House, *Guidelines on Religious Exercise and Religious Expression in the Federal Workplace*, 1997 WL 475412 (Aug. 14, 1997) ("1997 Guidelines"); Memorandum for All Executive Departments and Agencies, from Jefferson B. Sessions III, Attorney General, *Re: Federal Law Protections for Religious Liberty* (Oct. 6, 2017) ("2017 Memorandum"). In addition, you have asked us whether situational telework may be an appropriate religious accommodation for religious practice given the federal government's directive that its employees return to "in-person" work on a "full-time basis."[1]

For the reasons we explain below, we conclude that the 1997 Guidelines and 2017 Memorandum may generally be enforced according to their terms except in two key respects. Furthermore, we conclude that situational telework can and should be used as a form of religious accommodation despite the "in-person work" directive.[2]

---

[1] Memorandum for the Heads of Executive Departments and Agencies, from President Donald J. Trump, *Re: Return to In-Person Work*, 90 Fed. Reg. 8251, 8251 (Jan. 20, 2025) ("Return to In-Person Work Memorandum").

[2] Our conclusion is consistent with recent guidance from the Office of Personnel Management ("OPM") explaining that "[w]hile implementing Return to In-Person Work,

## I.

Title VII of the Civil Rights Act of 1964 charges the Equal Employment Opportunity Commission ("EEOC") with ensuring that federal employees remain "free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. Executive Order 12067 directed that, in executing this mandate, EEOC "shall provide leadership and coordination to the efforts of Federal departments and agencies to enforce" all federal discrimination statutes and "advise and . . . consult with" other agencies during the development of rules and policies that may affect equal opportunity—including equal opportunities to those of different religious faiths. 43 Fed. Reg. 28,967, 28,967–68 (June 30, 1978).

Pursuant to those responsibilities, EEOC provides guidance to agencies and employees with respect to various federal non-discrimination statutes, including how to develop policies and resolve situations involving potential violations of an employee's religious freedoms.[3] Although we are not aware of a guidance document in which EEOC has specifically addressed telework in a religious-discrimination context, for more than 20 years, it has acknowledged that telework and similar flexible work schedules can constitute reasonable accommodations within the meaning of similar federal anti-discrimination statutes.[4] In preparing its current guidance, EEOC relied on two statements of federal law.

---

agencies are strongly encouraged, where feasible, to consider telework as a reasonable accommodation for religious practices." *See* Memorandum for Heads and Acting Heads of Departments and Agencies, from Scott Kupor, Director, OPM, *Re: Reasonable Accommodations for Religious Purposes* at 3 (July 16, 2025) ("Kupor Memorandum").

[3] *See, e.g.*, EEOC, EEOC-NVTA-2008-2, *Questions and Answers: Religious Discrimination in the Workplace* (July 22, 2008), https://www.eeoc.gov/laws/guidance/questions-and-answers-religious-discrimination-workplace; EEOC, EEOC-NVTA-2008-1, *Best Practices for Eradicating Religious Discrimination in the Workplace* (July 22, 2008), https://www.eeoc.gov/laws/guidance/best-practices-eradicating-religious-discrimination-workplace.

[4] *See* EEOC, EEOC-NVTA-2003-1, *Work at Home/Telework as a Reasonable Accommodation* (Feb. 3, 2003), https://www.eeoc.gov/laws/guidance/work-hometelework-reasonable-accommodation (discussing the question in the context of the Americans with Disabilities Act).

*First*, President Clinton issued a directive in 1997 "addressing religious exercise and religious expression" that "appl[ies] to all civilian executive branch agencies, officials, and employees in the Federal workplace." 1997 Guidelines at *1. Without attempting to be comprehensive, the 1997 Guidelines "answer[ed] the most frequently encountered questions in the Federal workplace," while simultaneously recognizing that "additional facts and circumstances . . . may require a different result from the one the Guidelines indicate." *Id.* Because those guidelines are quite lengthy, we will not recite them here. But, as a general matter, they required that "agencies shall treat all employees with the same respect and consideration, regardless of their religion (or lack thereof)," and directed that agencies "shall permit personal religious expression by Federal employees to the greatest extent possible, consistent with requirements of law and interests in workplace efficiency." *Id.*

On the same day that President Clinton issued the 1997 Guidelines, he also issued a memorandum "directing the heads of executive departments and agencies . . . to comply with the [1997] Guidelines" and admonishing "[a]ll civilian executive branch agencies, officials, and employees [to] follow [them] carefully." *Memorandum on Religious Exercise and Religious Expression in the Federal Workplace*, 2 Pub. Papers of Pres. William J. Clinton 1104, 1104 (Aug. 14, 1997) ("1997 Memorandum").

*Second*, early in his first term, President Trump directed the Attorney General to, "as appropriate, issue guidance interpreting religious liberty protections in Federal law." Exec. Order No. 13798, 82 Fed. Reg. 21,675, 21,675 (May 4, 2017). Attorney General Sessions responded by issuing the 2017 Memorandum, which emphasized that "[r]eligious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place" but also to engage in "religious observance and practice." 2017 Memorandum at 1. It explained that "[e]xcept in the narrowest circumstances, no one"—including federal employees—"should be forced to choose between living out his or her faith and complying with the law." *Id.* Although the 2017 Memorandum largely tracked the guidelines issued 20 years earlier, it included a lengthy legal appendix setting forth the constitutional and statutory basis for its guidance. *Id.* at 1a–17a.

Since the issuance of these documents, there have been fundamental changes to how we work and significant legal changes in how work must

accommodate worship. In particular, the COVID-19 pandemic sent nearly all workers (public and private) home—in what some thought would be a permanent change to the workplace. *See, e.g.*, Memorandum for Heads of Executive Agencies and Departments, from Kiran A. Ahuja, Director, OPM, *Re: Advancing Future of the Workforce Policies and Practices to Support Mission Delivery* (Mar. 7, 2023). Due to lack of efficiency and other costs associated with full-time work-from-home arrangements, however, the trend is now for American workers to return to their desks, *see* Connor Borkowski & Rifat Kaynas, *Telework Trends*, 14 Beyond the Nos.: Emp. & Unemp. (Mar. 25, 2025), https://www.bls.gov/opub/btn/volume-14/telework-trends.htm, and President Trump directed such a change for federal workers, *see* Return to In-Person Work Memorandum, 90 Fed. Reg. at 8251.

Against this backdrop, the technological advances and process changes that were accelerated by a full work-from-home policy have allowed for new forms of religious accommodation in certain circumstances. Moreover, in recent years the Supreme Court has issued two decisions that bear directly on existing guidance: *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), which clarified that employers cannot refuse to provide a religious accommodation merely because it carries a "more than a de minimis cost," *id.* at 2295 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)), and *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), which clarified the circumstances under which a public employee's private religious speech will be imputed to his employer, *id.* at 2427–32.

You asked us to consider whether these developments require changes in how EEOC implements the 1997 Guidelines and 2017 Memorandum. We agree that they do, but only at the margins.

## II.

### A.

Several sources of law guarantee federal employees' right to religious freedom in the workplace. The Constitution provides the baseline that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Title VII builds upon those protections by prohibiting the federal government, state

and local governments, and covered private sector employers from discriminating against an employee "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a); *id.* § 2000e-16(a).[5] Recognizing that Americans adhere to all doctrines, dogmas, and creeds, Congress has defined "religion" broadly to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

In 1993, Congress expanded those protections still further with passage of the Religious Freedom Restoration Act ("RFRA"), which mandates that the federal government "shall not substantially burden a person's exercise of religion" unless the government "demonstrates that application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(a)–(b); *see also City of Boerne v. Flores*, 521 U.S. 507, 533–36 (1997). The 1997 Guidelines that President Clinton promulgated sought to formalize Executive Branch implementation of these requirements. *See generally* 1997 Guidelines.

We have previously recognized that the 1997 Guidelines "plainly bound the internal operations of the civilian Executive Branch" at the time they were issued, and that they continue to apply so long as there is "no presidential action to revoke them." *Religious Objections to the Postal Service Oath of Office*, 29 Op. O.L.C. 37, 44 (2005) (internal quotation marks omitted); *see also Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000) (explaining that "there is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order" and that presidential directives do "not automatically lapse upon a change of administration").

---

[5] Title VII defines "employer" to include most government-affiliated entities as well as a private employer "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b); *id.* § 2000e-16(a). For purposes of this opinion, we will use "employer" to refer only to covered employers.

No presidential action has revoked the 1997 Guidelines. To the contrary, as noted above, President Trump issued an Executive Order directing the Attorney General to "issue guidance interpreting religious liberty protections in Federal law" to "guide all agencies in complying with relevant Federal law." Exec. Order No. 13798, 82 Fed. Reg. at 21,675. In the 1997 Memorandum, Attorney General Sessions subsequently affirmed that the 1997 Guidelines "have the force of an Executive Order"; stated that they "provide useful guidance to private employers about ways in which religious observance and practice can reasonably be accommodated in the workplace"; and instructed that all federal agencies should review and "ensure that they are following" the 1997 Guidelines. 2017 Memorandum at 6–7. Because no President has taken further action in the intervening eight years, the 1997 Guidelines as interpreted in the 2017 Memorandum remain binding throughout the Executive Branch.

**B.**

Although the 1997 Guidelines and 2017 Memorandum remain operative as a general matter, intervening changes in law have superseded two specific aspects of the Guidelines.

*First*, in addressing Title VII's requirement that employers "reasonably accommodate" an employee's "religious observance or practice" unless such accommodation would impose an "undue hardship on the conduct of the employer's business," 42 U.S.C. § 2000e(j), the 1997 Guidelines and the 2017 Memorandum assert more than once that "an agency need not make an accommodation that will result in more than a de minimis cost to the agency," 1997 Guidelines at *8.[6] This language comes from the 1977 *Hardison* decision, which concluded that "[t]o require [an employer] to bear more than a de minimis cost in order to give" a requested accommodation would impose "an undue hardship" within the meaning of Title VII because it "would involve unequal treatment of employees on the basis of

---

[6] *See also* 1997 Guidelines at *13 ("Though an employer need not incur more than de minimis costs in providing an accommodation, the employer hardship nevertheless must be real rather than speculative or hypothetical."); 2017 Memorandum at 10a (reaffirming that "an accommodation might pose an 'undue hardship' if it would impose 'more than a de minimis cost' on the business, such as in the case of a company where weekend work is 'essential to [the] business' and many employees have religious observances that would prohibit them from working on the weekends" (alteration in original)).

their religion." *Hardison*, 432 U.S. at 84. By 1997, many lower courts had interpreted *Hardison* to equate "undue hardship" with a "de minimis cost" standard. *See Groff*, 143 S. Ct. at 2292.

But the Supreme Court held in *Groff* that an employer experiences "undue hardship" only where the burden posed by an accommodation would be "substantial in the overall context of an employer's business." *Id.* at 2294. Thus, under Title VII, an agency cannot deny a religious accommodation if the burden imposed on the agency by the accommodation in the context of the agency's work is insubstantial. Agencies should therefore disregard references in the 1997 Guidelines to the "de minimis" standard as inconsistent with their statutory obligations. *See, e.g.*, Memorandum from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Executive Order Entitled "Amendments to Executive Order 12293, The Foreign Service of the United States"* (Mar. 10, 2005) (noting that a prior Executive Order "ha[d] been superseded by recent statutory amendments").

We note that the day-to-day effect of this change may well be minimal. The 1997 Guidelines reference the "de minimis" standard only twice, *see* 1997 Guidelines at *8, *13, and none of the examples given in the Guidelines depend on that erroneous standard. Moreover, as the Supreme Court has observed, EEOC has long attempted to "soften" the impact of the "de minimis" standard by explaining that "no undue hardship is imposed by temporary costs, voluntary shift swapping, occasional shift swapping, or administrative costs." *Groff*, 143 S. Ct. at 2293, 2296. Agency precedent and practice may thus, as a practical matter, often already comply with the standards articulated in *Groff*. At the same time, agencies must take care not to apply prior precedents or guidance mechanically, especially insofar as those precedents or guidance recite the improper "undue hardship" standard.

*Second*, the 1997 Guidelines provide that, although agencies generally may not "restrict personal religious expression by employees in the Federal workplace," agencies must restrict such expression where it "creates the appearance, to a reasonable observer, of an official endorsement of religion." 1997 Guidelines at *1–2; *see also id.* at *3–4, *9.[7] Again, that

---

[7] Unlike the question of what constitutes "undue hardship," the 2017 Memorandum does not address this issue.

restriction reflected Supreme Court precedent that has since been abrogated. Specifically, at that time, the Court's Establishment Clause jurisprudence focused on "estimations about whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion," *Kennedy*, 142 S. Ct. at 2427 (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 593 (1989))—a test that ultimately derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

Since 2017, however, the Supreme Court has recognized that this test had numerous "shortcomings" that led to "a great array of laws and practices [coming] to the Court," presenting questions "that the *Lemon* test could not resolve." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2080 (2019) (plurality opinion); *see also id.* at 2101 (Gorsuch, J., concurring) (agreeing with the plurality that "*Lemon* was a misadventure"). For example, the test could not "'explain the Establishment Clause's tolerance . . . of the prayers that open legislative meetings . . . ; certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays, including Thanksgiving.'" *Id.* at 2080–81 (plurality opinion) (quoting *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring in the judgment) (second alteration in original)). The Court ultimately rejected *Lemon*'s "endorsement test," instead "instruct[ing] that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy*, 142 S. Ct. at 2428 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).

The 1997 Guidelines' restriction on religious speech that "creates the appearance of" an "official endorsement," *see* 1997 Guidelines at *1–2, can no longer be enforced in light of subsequent legal developments. Given that the "appearance of . . . official endorsement" restriction is no longer legally mandated, *see Kennedy*, 142 S. Ct. at 2427, respecting the freedom to engage in religious speech "to the greatest extent practicable and to the extent permitted by law," Exec. Order No. 13798, 82 Fed. Reg. at 21,675, requires abandoning that unnecessarily restrictive test.

In the absence of an Establishment Clause justification, the 1997 Guidelines' "official endorsement" restriction impermissibly discriminates against religious expression. Indeed, the presidential memorandum announcing the 1997 Guidelines expressly recognizes that this restriction

serves as an "exception" to a general "principle of neutrality" that otherwise forbids an agency from "subject[ing] religious speech to greater restrictions than other speech entitled to full constitutional protection." 1997 Memorandum, 2 Pub. Papers of Pres. William J. Clinton at 1104. The Supreme Court has recently held that deviations from neutrality adverse to religion are impermissible unless they are narrowly tailored to a compelling state interest. *Kennedy*, 142 S. Ct. at 2426–28. And the Supreme Court has likewise made clear that adherence to erroneous understandings of the Establishment Clause—such as those that underlie the "official endorsement" test—does not qualify as such an interest. *Id.* at 2427–28. The 1997 Guidelines' "official endorsement" test thus creates a special restriction on religious expression without a constitutionally valid justification.

For the avoidance of doubt, our conclusion that the "appearance of official endorsement" test can no longer be enforced does not mean that all religious expression in the workplace must be permitted. Nor does it mean that the Constitution imposes no limits on religious conduct or expression by government employees. The Supreme Court has never cast doubt on the principle that government employers can prohibit disruptive or coercive behavior by their employees regardless of the religious nature of that conduct. *See id.* at 2430–32.

Agencies should thus adhere to the common-sense proposition that "the workplace is for work, and an agency may restrict any speech that truly interferes with its ability to perform public services." 1997 Memorandum, 2 Pub. Papers of Pres. William J. Clinton at 1104. Moreover, activities that are "coercive" must still be prohibited—if, for example, a supervisor were to insist that an employee "participate in religious activities as a condition of continued employment, promotion, salary increases, preferred job assignments, or any other incidents of employment." 1997 Guidelines at *5. But whenever an agency allows nonreligious private speech or conduct, it must also allow similar speech or conduct of a religious nature. In sum, there is no "exception" to a general "principle of neutrality" for expression merely because it could create the "appearance of official endorsement." Any statements in the 1997 Guidelines to the contrary should be disregarded in favor of the Supreme Court's current test based on "historical practices and understandings" of similarly situated employees. *Kennedy*, 142 S. Ct. at 2428. (internal quotation marks

omitted). To the extent there are questions about how to implement this new test in particular scenarios, our Office as well as others in the Department of Justice stand ready to assist.

## III.

Next, we consider whether agencies may, in appropriate circumstances, continue to authorize employees to engage in situational telework as a form of religious accommodation consistent with the Return to In-Person Work Memorandum. That memorandum directed:

> Heads of all departments and agencies in the executive branch of Government shall, as soon as practicable, take all necessary steps to terminate remote work arrangements and require employees to return to work in-person at their respective duty stations on a full-time basis, provided that the department and agency heads shall make exemptions they deem necessary.
>
> This memorandum shall be implemented consistent with applicable law.

90 Fed. Reg. at 8251. Read in context of both the President's commitment to religious freedom and existing federal law, we do not see the Return to In-Person Work Memorandum as an impediment to using situational telework as an accommodation for federal employees' religious practices in appropriate circumstances

### A.

As previously discussed, Title VII requires government employers to provide reasonable accommodations for an "employee's religious observance or practice" so long as an accommodation does not result in "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Requests for accommodations are especially common in connection with the observance of the Sabbath or other religious holidays, which may require a range of adjustments, including changes of job assignments, voluntary work schedule swaps, or flexible scheduling. *See* 29 C.F.R. § 1605.2(d)(l); *see also Groff*, 143 S. Ct. at 2296.

Although we are not aware of any regulation that identifies situational telework as a possible religious accommodation, such regulations are "not

intended to be all-inclusive." 29 C.F.R. § 1605.2(d)(1). Title VII requires "flexib[ility]," *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002), and a "case-by-case" approach in the formulation and implementation of such accommodations, *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 516 (6th Cir. 2002) (internal quotation marks and citation omitted). These are often best achieved through "bilateral cooperation . . . in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (internal quotation marks and citation omitted).

As telework has become more prevalent, both EEOC and courts have recognized that it may provide a viable option to accommodate individuals who are protected under federal anti-discrimination laws. The earliest example we have located is 2003 guidance issued by your office about accommodating individuals with disabilities who wish to work from home. EEOC-NVTA-2003-1, *supra* note 4. Although that guidance was issued in the context of another statute, courts have recognized that, under certain circumstances, an allowance for telework is a permissible—if not required—form of religious accommodation. *See, e.g.*, *Grimes v. N.Y. & Presbyterian Hosp.*, No. 23-CV-652, 2024 WL 816208, at *5–6 (S.D.N.Y. Feb. 26, 2024) (permitting a Title VII claim to proceed where plaintiff had requested, and was denied, a telework arrangement as a religious accommodation and plaintiff had few in-person responsibilities); *Jackson v. N.Y. State Off. of Mental Health*, No. 23-CV-04164, 2024 WL 1908533, at *8–9 (E.D.N.Y. May 1, 2024) (similar).

We understand from your office that permission to situationally telework on discrete occasions has historically been a successful form of religious accommodation in certain circumstances. For example, where an employee's workstation is a long distance from the location of a required religious observance, telework may reduce the number of hours the employee would otherwise take off for that observance. Such an arrangement has the potential to benefit all parties, minimizing overall absence and disruption and increasing efficiency in certain circumstances. *See* Kupor Memorandum, *supra* note 2, at 3 ("Telework can enable employees to fulfill religious duties without compromising agency missions.").

## B.

Read in context, the Return to In-Person Work Memorandum does not preclude offering religious accommodations that take the form of situational telework, for at least two reasons.

*First*, the memorandum directs only that agencies "terminate remote work arrangements" and "require employees to return to work in-person at their respective duty stations on a full-time basis." 90 Fed. Reg. at 8251. "Remote work" generally refers to an arrangement under which an employee "is scheduled to perform work at an alternative worksite and is not expected to perform work at an agency worksite on a regular and recurring basis."[8] As a matter of ordinary English, a requirement that something happens on a "regular and recurring basis" or "full time basis" assumes occasional departures or individualized exceptions.[9] By definition, "situational telework" is telework that happens "occasionally" and "is not part of an ongoing and regular telework schedule."[10] Indeed, OPM which is tasked by Congress with providing "policy and policy guidance" regarding telework, 5 U.S.C. § 6504(b)(1), has acknowledged that "situational telework" is permitted under the memorandum so long as it is "intermittent and not authorized as a substitute for routine or recurring telework."[11]

We think occasional telework prompted by specific, discrete religious circumstances clearly qualifies as "situational," rather than "routine" and

---

[8] *Remote Work: What Is the Definition of Remote Work?*, OPM, https://www.opm.gov/frequently-asked-questions/telework-faq/remote-work/ (last visited Sep. 17, 2025).

[9] This view is consistent with the understanding of "basis" in other legal contexts. For example, with respect to the federal sentencing guidelines, the Supreme Court has explained that "[e]ven if the sentencing judge sees a reason to vary from the Guidelines, if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, *then the Guidelines are in a real sense the basis for the sentence*." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (internal quotation marks omitted) (emphasis in original).

[10] *See Questions and Answers: What Telework Options Can I Make Available to Employees?*, OPM, https://www.opm.gov/frequently-asked-questions/future-of-work-faq/general/what-telework-options-can-i-make-available-to-employees/ (last visited Sep. 17, 2025).

[11] OPM, *FAQs on Return to In-Person Work Implementation Questions* at 2, http://opm.gov/telework/faqs-on-return-to-in-person-work-implementation-questions.pdf.

is therefore not covered by the plain language of the Return to In-Person Work Memorandum at all. That is particularly true given that Executive Orders, like any other documents, should be read in their broader context. *See, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (plurality opinion) (emphasizing that interpretation of legal texts is a "'holistic endeavor' which determines meaning by looking not to isolated words, but to text in context, along with purpose and history" (internal quotation marks and citation omitted)). It would make no sense for a President who has publicly (and repeatedly) committed to protecting religious liberty to the maximum extent allowed by law, *see, e.g.*, Exec. Order No. 13798, 82 Fed. Reg. at 21,675, to simultaneously prohibit minor alterations to work schedules and locations to allow for common religious observances.

*Second*, even if situational telework were generally implicated by the main clauses of the Return to In-Person Work Memorandum, religious accommodations would still be excluded from the memorandum's coverage. The memorandum includes two important qualifications: (1) "department and agency heads shall make exemptions they deem necessary," and (2) the "memorandum shall be implemented consistent with applicable law." 90 Fed. Reg. at 8251. Both qualifications support the use of situational telework as a form of religious accommodation. The former clearly grants agencies "broad leeway" in deciding when to permit telework. *Disclosure of Grand Jury Matters to the President and Other Officials*, 17 Op. O.L.C. 59, 62 (1993) (interpreting similar "deem necessary" language). In our view, such leeway includes the power to make exemptions for the protection of individual religious liberty, a paramount governmental interest recognized by both statute and executive order. *See, e.g.*, 42 U.S.C. § 2000bb(a)(3) ("The Congress finds that . . . governments should not substantially burden religious exercise without compelling justification."); Exec. Order No. 13798, 82 Fed. Reg. at 21,675.

In the case of jobs for which the agency *can* make exemptions, the fact that agency heads *may* make exemptions very likely means that they *must* make religious accommodations in appropriate circumstances for the memorandum to be "implemented consistent with applicable law." As the Supreme Court has unambiguously held, "a formal system of entirely discretionary exceptions" automatically renders a general requirement "not generally applicable" for purposes of the Free Exercise Clause. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021). And when

"government regulations are not neutral and generally applicable," they "trigger strict scrutiny under the Free Exercise Clause[] whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (emphasis in original). For positions where agency heads have discretion to permit telework situationally for non-religious purposes, the prohibition is not generally applicable and the agency may deny religious accommodations only if it can satisfy strict scrutiny. The strict scrutiny standard is "unforgiving," but we do not prejudge whether any particular agency will meet it. *See Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025).[12]

Again, in concluding that situational telework remains an available method of religious accommodation, we do not suggest that such accommodations are always appropriate. Whether a particular accommodation is warranted in any given context is always a "fact-specific inquiry." *Groff*, 143 S. Ct. at 2294; *see also US Airways, Inc. v. Barnett*, 535 U.S. 391, 405–06 (2002) (explaining that the reasonableness of a proposed accommodation turns on the "particular facts"). Some employees are unable to telework effectively given the nature of their duties, performance history, or other considerations. *See, e.g.*, *Beitsch v. Dep't of Defense*, EEOC Appeal No. 0120093495, 2011 WL 3555286 (July 22, 2011) (holding that telework was not an appropriate religious accommodation due to past telework abuse and poor performance). In those cases, situational telework may not be appropriate, regardless of the employee's asserted basis for requesting it, and agencies should consider adopting alternative accommodations, such as "shift swapping," *Groff*, 143 S. Ct. at 2296, or use of compensatory time off, 5 U.S.C. § 5550a(a).

We emphasize, however, that the *categorical* exclusion of situational telework as a form of religious accommodation has no basis in the Return

---

[12] A claimant pursuing a claim of religious discrimination typically must—like claimants pursuing similar claims for other of other forms of discrimination—first establish that he or she is, in fact, similarly situated to a relevant comparator. *Cf. Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 233 (7th Cir. 2004). When it comes to telework, not all government jobs are created equal because not all government functions can be performed away from the job site. Thus, an agency head's decision that a particular function must be performed at the job site is not subject to strict scrutiny merely because she offers telework for *different* jobs with *different* functions that are not similarly situated to a claimant's job.

to In-Person Work Memorandum. Relatedly, we also note that refusing such an accommodation in the name of purported fairness toward employees who have returned to work would be inconsistent with Title VII. *See Barnett*, 535 U.S. at 397 ("By definition, any special 'accommodation' requires the employer to treat an employee with a disability differently, *i.e.*, preferentially."); *Augustine V. v. VA*, EEOC Appeal No. 2023004016, at 8 (Aug. 4, 2025) (holding that "mere disgruntlement in the ranks over Complainant's accommodation" does not establish an undue hardship and that an entitlement to a religious accommodation does not "hinge on the magnanimity" of one's coworkers). In fact, such an approach would likely violate both Title VII and the Free Exercise Clause because it would reflect "hostility" to "the very notion of accommodating religious practice." *Groff*, 143 S. Ct. at 2296. Refusals to approve situational telework as a religious accommodation must instead be based solely on the genuine needs of the agency and the specific facts at issue. Agencies should therefore continue to offer such accommodations when consistent with agency needs and with the particular employee's facts and circumstances.

## IV.

For the reasons discussed above, we conclude that the 1997 Guidelines and 2017 Memorandum generally remain in effect, but that agencies should disregard all references to the "de minimis" standard for determining an undue hardship and the "appearance of official endorsement" test for determining Establishment Clause violations. In addition, we conclude that the Return to In-Person Work Memorandum does not preclude—and, in some circumstances, Title VII may require—the appropriate use of situational telework as a form of religious accommodation.

LANORA C. PETTIT
*Deputy Assistant Attorney General*
*Office of Legal Counsel*